THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM PHILLIPS, Defendant-Appellant.

First District (2nd Division)   No. 1—86—0960

Opinion filed June 30, 1989.—Rehearing denied August 14, 1989.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Joseph G. Howard, and Brian T. Sexton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN* delivered the opinion of the court:

The defendant was indicted with Marvin Stutts and Bryant Stutts for a number of offenses, including aggravated kidnapping, kidnapping, aggravated battery, attempted murder, unlawful use of weapons and aggravated criminal sexual assault. Bryant Stutts pleaded guilty and was sentenced to 13 years' imprisonment. The defendant and Marvin Stutts were tried by a jury. The charges against Marvin Stutts at the time of trial were aggravated criminal sexual assault, aggravated kidnapping and kidnapping; and the charges against the defendant were aggravated criminal. sexual. assault, attempted murder, aggravated kidnapping, kidnapping, aggravated battery and unlawful use of weapons. Marvin Stutts was found not guilty of aggravated criminal sexual assault and guilty of aggravated kidnapping and kidnapping. The defendant was found not guilty of aggravated criminal sexual assault and attempted murder and was found guilty of aggravated kidnapping, kidnapping, aggravated battery and unlawful use of weapons. He was sentenced to concurrent terms of seven years' imprisonment for aggravated kidnapping and four years for each of the

*Justice Egan participated in the decision of this case prior to his assignment to the sixth division.

other offenses. He contends that various errors by the trial court as well as improper argument by the State warrant a new trial. Additionally, he claims that his sentence of seven years for aggravated kidnapping constituted an abuse of discretion. No issue is made of the sufficiency of the evidence to support the verdict against the defendant, who was found guilty under the accountability statute; but, since his principal claim of error is the refusal to give a compulsion instruction, a detailed recitation of the evidence is required.

On Saturday, November 3, 1984, Bryant Stutts (Stutts), a long-time friend of the defendant, went to Partina Purdie's (Purdie's) home with a letter and a rose for her. Purdie, who had been Stutts' girlfriend for about three years, had recently broken off the relationship; and he was seeking a reconciliation.

She testified as follows.

She read the letter, tore it up and threw it in the garbage in front of Stutts. Stutts did not leave when Purdie asked him, and her brother "put him out." Around 9 to 9:30 p.m. her date, Michael Haygood, arrived. After Haygood had parked his 1984 Toyota Celica and entered the house, Stutts returned. Purdie spoke to Stutts at the front door and would not allow him to enter the house. The conversation ended with Purdie slamming the door. Stutts observed Haygood's car parked in front of the house.

Purdie and Haygood left for a movie at River Oaks Theater in Calumet City. After they had seen the movie, they walked to Haygood's car. She saw Stutts walking toward them with his arm "kind of like along his leg." When Stutts got about 10 feet away, he pointed a shotgun at them and ordered them into a car. Haygood ran and ducked behind another car. Stutts grabbed Purdie and "dragged" her to a car from which the defendant got out and opened the back door. Stutts pulled her into the back seat, and the defendant got in the driver's seat. Purdie was surprised to see the defendant and said, "So you're in on this, too?"; and he said, "Yeah." The defendant pulled the car out of the parking lot "fast."

While the defendant was driving, Stutts began to punch Purdie in the face. The beating was "steady," and Stutts threatened that he was going to kill her. She was crying and pleaded with Stutts to stop beating her. Stutts struck her in the head with the butt of the shotgun, causing it to discharge. The shot went between Purdie's arm and body and blew a large hole in the upright portion of the back seat. Stutts shouted, "Bitch, you done shot me." The defendant asked Stutts if he had been hit, and Stutts answered that he thought so but did not know how bad it was. The defendant continued driving to

"some dark place" under a viaduct.

When the car stopped and Stutts opened the door, Purdie grabbed the gun from him and threw it up on a hill. He dragged her up the hill and got the gun. At that time she was not wearing shoes. The defendant had picked up her shoes and purse and put them in the trunk of the car. Stutts told her, "Oh, girl, what me and Bill are going to do to you tonight."

Stutts told the defendant to take the car, which belonged to Stutts' mother, and come back in the car owned by the defendant's mother. At the time the defendant drove off, Purdie was bleeding and kept asking Stutts not to hit her anymore.

After the defendant left, Stutts began asking her questions about Haygood. He told her to take down her pants. When she refused, he pointed the gun at her and indicated with the gun that she was to pull down her pants. He pulled down his pants. At that time the car containing the defendant and Marvin Stutts (Marvin) was coming, and Stutts pulled up his pants. It was the same car that the defendant had driven away in, but this time Marvin was driving and the defendant was on the passenger side. Marvin and the defendant got out of the car, and Stutts put Purdie in the back seat on the floor. Marvin drove off with the defendant on the passenger side and Stutts and Purdie in the back seat. Stutts still had the gun. He made her lie on the floor. Marvin asked what was going on, and Stutts told him, "This bitch was out with another man." At that time there was still blood on her face. Marvin drove to a liquor store, where he bought some beer. From the time they left the forest preserve to the time they arrived at the liquor store, Stutts was still hitting her in the face. She was crying. All three of the men drank beer, but she refused to drink any. She was wiping the blood from her face on the back seat.

Marvin drove to a motel after Stutts told him to. Stutts gave Marvin his identification and money and told him to get a room and to use a false license plate number. Marvin came back and said there were no rooms. Purdie was crying and bleeding. She could see blood dripping from her head. Marvin drove to a motel on Stony Island Avenue. The men were all laughing because Haygood ran and left her. Marvin went into the second motel with Stutts' identification and money and returned with the key and gave it to Stutts. Stutts gave the gun to Marvin and the defendant and told them to get rid of it. Marvin got Purdie's shoes and purse from the trunk and gave them to her. Stutts told Marvin to take the back seat out of the car and to tell their mother that someone had stolen it. It had a big hole in it from the shotgun blast, and blood was everywhere. Marvin and the defend-

ant left in the car.

Stutts made her go into a room, and she sat down on the bed. He told her to take off her clothes. When she refused he pulled her in front of the mirror and told her to look at herself. She could barely see her face because it was covered with blood and her lip was big. He made her shower and told her to get on the bed. She testified that he got on top of her and "raped" her. After he was finished, he called his home and then told her that they had to get out of the motel. He then called his father and asked him to meet them at 79th Street and Stony Island Avenue, because he was in trouble. He made her walk down Stony Island after she dressed. They took a cab to 79th Street and Stony Island, where they met Stutts' father. Stutts' father asked her if she wanted him to take her to a hospital. She asked that he just take her home.

Purdie's mother did not recognize her at the door when she walked past. She subsequently passed out in her brother's arms and was taken to St. Francis Hospital. Vaginal swabs were taken, and it was stipulated that the swabs revealed the presence of sperm. She never saw Stutts point the shotgun at either the defendant or Marvin and neither one offered her any assistance.

Michael Haygood's testimony as to what occurred at the parking lot was the same as that of Purdie. He also testified that one of his tires had been cut, causing it to go flat, and broken bottles had been placed behind the three other wheels.

Detective Robert Dywer was assigned to investigate and went to the home of Marvin Stutts. Marvin took him to the basement and Dwyer observed a hacksaw and hacksaw blade, part of a shotgun barrel, the chamber housing for shells and part of a rifle stock barrel which he thought had been sawed off. Marvin was arrested and taken to Area 2 Headquarters. Dwyer also examined the car used and discovered a shotgun hole in the back upright portion of the backseat. He also recovered Purdie's watch and earring from the back seat.

Stutts was arrested around 4 a.m., and the defendant at 7 a.m. at his home. He was questioned by Assistant State's Attorney Earl Grinbarg, who testified that he advised the defendant of his rights, and the defendant told him what had occurred. Grinbarg transcribed the defendant's statement verbatim. The defendant reviewed the two-page statement, corrected and signed it.

In that statement the defendant said the following: Stutts picked him up at his girlfriend's at 9:30 p.m. He said that they were going to River Oaks "to fuck with Tina [Purdie] because he had seen Tina going to the movies there with some other guy." Stutts showed him the

sawed-off shotgun he had. They waited in the parking lot for Purdie to come out; and when she did, Stutts put the sawed-off gun up his sleeve and got out of the car. He walked up to her and her boyfriend. The boyfriend saw the gun and ran. Purdie tried to get away, but Stutts aimed the gun at her and dragged her into the car. Stutts told the defendant to drive. Stutts got in the back seat with Purdie and started hitting her with his fists and with the handle part of the gun. Stutts told him to drive to 127th and Halsted under the viaduct. He dropped them off there when Stutts told him to go back and get his mother's car. Stutts said "he was going to kill the bitch." When he left, he really thought Stutts would kill her. He went to Marvin's and told him what had happened and that he thought Stutts was going to kill Purdie. They drove back together in the same car. Stutts got back in the car with the shotgun he had kept while waiting with Purdie. Stutts then told Marvin to go to Sibley and Torrence to a motel. Marvin went in to get a room for Stutts, but there were no vacancies. Stutts said to go to the Ranch Motel at 93rd and Stony Island Avenue. They did and dropped Stutts and Purdie off after Marvin got a room. Stutts told them to get rid of the gun. They drove to the home of a man named Lorenzo at 124th and Wentworth, and Marvin left the shotgun with him. He never hit Purdie, but he watched Stutts hit her and heard Stutts tell her to keep her head down.

The defendant's testimony was at variance with his statement. He testified that around 9 p.m., he was at his girlfriend's house when Stutts, whom he had known for several years, came to see him. Stutts asked if he would drive out to River Oaks Theater with him to pick up his girlfriend, "Tina." He could see that Stutts had been drinking but agreed to go with him.

During the ride to the theater Stutts drove in a "zigzag" fashion and the car almost went off the ramp exiting the Calumet Expressway. He also stopped off at a liquor store and purchased a half pint of whiskey. After they arrived at the theater, Stutts parked the car in the parking lot. He began drinking and complaining about Purdie. Stutts passed the bottle to the defendant, and he took a "hit" off it. The entire conversation lasted about an hour. On one occasion Stutts got out of the car and went to the rear and opened the trunk. He assumed that Stutts was urinating during this time. When Stutts came back he placed a screwdriver on the seat and resumed talking about Purdie. When the show let out, Purdie and Haygood started approaching the vicinity of the Stutts car. Stutts got out and walked over to Purdie. From a distance of roughly 10 feet, the defendant saw Stutts point "something that look[ed] like a pipe that was up his

sleeve" and then grab Purdie's arm. At that point her boyfriend fled. Stutts walked Purdie back to the car and opened the rear door on the driver's side. Purdie entered the car after Stutts. When Stutts and Purdie got into the car, the defendant was in the front passenger seat.

His testimony at that point was as follows:

"Q. Now, when you got in, you say you observed what?

A. Well, when he got in, I had seen the barrel of a gun pointing at me.

Q. Well, what did you think at that time?

A. At that time, I was scared. I didn't know what to do. If—you know, I thought that he would shoot me if I didn't do what he said.

Q. Why would you think that?

A. Well, I didn't see a gun, until he had got into the car. So, I thought that he was—you know, him and Tina was just going to talk. I didn't know what he was doing.

Q. Well, didn't you see the gun when Michael—or when the young man ran away?

A. No. Like I said, I thought it was a pole. I didn't know what it was. It looked like a pole to me.

Q. You realized it was a gun, though, when he got in the car?

A. Right.

Q. Now, what happened after he got in the car? When you saw the gun?

A. Well, he had told me to get in the driver's seat, and pull off.

* * *

A. Well, to me he had looked like he was upset, or something, or for some reason, his eyes was red, and he was drunk, and he looked like he was nervous, because when he got in the car, he had walked up to the— *** He had got out of the car, and walked up to Tina, he was—he was shaking, shaking at that time. So when he got back in the car, he was scared, or nervous or something.

Q. What happened next, after he was in the car with her?

A. Well, I had turned around, and seen the barrel of the shotgun pointed at me in my face. Right there, I was scared, I was terrified. I didn't know what to do, I couldn't say anything.

Q. Why couldn't you say anything?

A. I was surprised.

Q. What surprised you?

A. The gun barrel.

Q. What happened next?

A. He told me to get in the driver's seat, and pull off."

Later he testified that when they got on the expressway, Stutts kept hitting Purdie in the face, and he told Stutts, "Why don't [you] just stop hitting her, and just talk to her?" Stutts told him to just kept driving. He didn't know whether the gun was in Stutts' sleeve at that point because he didn't bother to turn around to look. Purdie asked Stutts to stop hitting her, but Stutts did not stop.

When the defendant got on the expressway he started doing "75" because he hoped that a police car would see him. He was scared and didn't know what else to do. It "seemed like" he could not reason with Stutts so that Stutts would stop beating her. There was a police car going in the opposite direction, and he was blinking the lights on and off hoping the police would see the blinking lights and that he was speeding. Stutts told him to slow down, so he did. At that time Stutts was still hitting Purdie in the face, and she was crying steadily. Before he got off the expressway, the gun discharged in the car. He guessed that Stutts had put the gun down and that Purdie had tried to get the gun from him, and it went off in the back seat. He got off at 130th Street because Stutts told him to. He was scared when he heard the gun go off and thought Purdie had been shot. Stutts said, "Oh, I'm shot." He asked Stutts if it was serious and Stutts said, "Yeah." The defendant asked Stutts if he wanted to go to a hospital, and Stutts told him to just keep driving.

When he was asked why he did not just stop driving and say "I'm not going anyway," he answered, "I don't know. I was scared, I didn't know what to do." He said he tried to reason with Stutts by asking him would he stop abusing Purdie the way he was doing. Stutts did not say anything other than, "Keep driving." He kept driving because Stutts told him to, "plus he had the shotgun, too." He went to the forest preserve at the direction of Stutts. He thought that Stutts would kill him and Purdie and probably himself. He didn't know why he thought that. He had never seen Stutts act that way before. After the car stopped he got out after they did. Stutts pushed Purdie out of the car. Stutts had taken her shoes and purse and thrown them out. He was standing by the driver's door, and Stutts came over to him and told him to take the car home and come back in the car of the defendant's mother.

He drove to Stutts' home and told Marvin that his brother was at

the forest preserve, that he had a shotgun and that he had beaten up Purdie very badly. He and Marvin went back in the same car with Marvin driving. When he returned to where he had left them, he got out of the car and called Stutts, who came out with Purdie. It had taken him about five minutes to go from Stutts' house back to where he had left them. Stutts had his arm around Purdie, and they walked back toward the car. Stutts was hugging Purdie. He heard Purdie mention to Stutts that "she wanted to go to a motel." Marvin drove to a motel at 159th and Torrence but was unable to get a room. Stutts told Marvin to go to a motel at 93rd and Stony Island where he and Purdie used to go when they were dating. Before they got to that motel they stopped at a liquor store called "The Shrimp Boat." Marvin purchased a six-pack of beer. He, Marvin and Stutts each had one beer. They went to the motel, and Marvin got a room for Stutts. Stutts and Purdie were in the back seat, and there was no fighting going on at that time. There was no fighting from the time they left the forest preserve and went to the first motel. There was no arguing. He saw Purdie and Stutts go into the motel. He was no longer "scared" because it seemed like everything had "cleared up." Before Stutts left he had handed Marvin a piece of the gun and told him to take it home and "put it up." He and Marvin left and went to Lorenzo Eidelberg's home. Marvin took the gun out of the trunk and took it to Lorenzo's brother. The defendant had noticed that Purdie had some bruises on her face. Stutts had his arm around Purdie; they were hugging when he observed them walk into the motel.

On cross-examination he admitted giving a statement to an assistant State's Attorney in the presence of a police detective. However, he denied making those statements which showed his complicity in Stutts' plan to get Purdie; they were lies made up by the assistant State's Attorney.

■ The defendant first contends that the trial court committed reversible error when it refused to give an instruction on the affirmative defense of compulsion, which is defined as follows in section 7—11 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 7—11):

> "(a) A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

Since compulsion is an affirmative defense, unless the State's evi-

dence raises the issue involving the defense, the defendant "must present some evidence thereon." (Ill. Rev. Stat. 1985, ch. 38, par. 3—2(a).) The supreme court has held that "very slight evidence" of a defense will justify the giving of an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31.) But the court cautioned that "the merest factual reference or witness's comment[s]" may not necessarily support an instruction on an affirmative defense. *People v. Bratcher* (1976), 63 Ill. 2d 534, 541, 349 N.E.2d 31. See also *People v. Currie* (1980), 84 Ill. App. 3d 1056, 405 N.E.2d 1142.

■ In determining whether an instruction on the defense of compulsion is necessary, a reviewing court is not authorized to weigh the evidence upon a question of whether or not compulsion is shown but must determine whether or not the issue was sufficiently raised to justify such an instruction. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 534 N.E.2d 1043 (a case which upheld the refusal of a compulsion instruction).) In this regard, we recognize that it is not relevant that the defendant's testimony is at odds with the testimony of Purdie as well as his own statement. If his testimony constitutes "some evidence," that is enough. "Some evidence" has been described as evidence sufficient to raise an issue of fact for the jury, creating a reasonable doubt as to the defendant's guilt. *People v. Redmond* (1974), 59 Ill. 2d 328, 337-38, 320 N.E.2d 321.

The issue, therefore, is narrowed to whether the defendant's testimony was "some evidence" that he was acting under the compulsion of threat or menace of the imminent infliction of death or great bodily harm and that he *reasonably* believed death or great bodily harm would be inflicted upon him if he did not perform certain acts. The case principally relied upon by the defendant is *People v. Adcock* (1975), 29 Ill. App. 3d 917, 331 N.E.2d 573. In that case, the defendant, Adcock, was in a car with men named Youngblood and Thorn when Youngblood drew a weapon on Thorn and forced Thorn to participate in a robbery of a nearby tavern in Chicago. The opinion is silent about the defendant's activities while the robbery was taking place. After the robbery, the three men left Chicago to drive to Kentucky. *Adcock guarded Thorn constantly, holding a gun to Thorn's neck,* while Youngblood drove. Youngblood, who was extremely intoxicated, threatened to shoot Adcock *if he continued to guard Thorn with the gun.* After a tire blowout, Youngblood flagged down a truck operated by a man named Keene. Youngblood drew a gun on Keene and forced him to lie down in a ditch. Adcock and Thorn approached Youngblood; and Youngblood threatened *to shoot Thorn* if *he* did not return to the Keene truck. There was evidence that *Adcock also or-*

*dered Keene into the ditch and made him lie down on his stomach.* Adcock and Youngblood drove away in Keene's truck and were subsequently arrested and charged with the robbery of Keene.

Adcock testified that he approached Youngblood and Keene to assure there would be no violence and that he returned to the truck with Thorn because he feared for his own safety. (Although Youngblood had threatened to shoot Thorn, not Adcock.) He also testified that he drove away in Keene's truck with Youngblood, because he feared he would be shot if he refused. The Appellate Court, Second District, reversed Adcock's conviction because the trial court refused to give a compulsion instruction.

We must express strong misgivings about the holding of *Adcock*, because there was no evidence that Youngblood ever threatened to kill or harm Adcock if he did not participate in the Keene robbery. Ironically, the only threat against Adcock was made to compel him to stop using a gun against Thorn. The opinion makes no mention of what Adcock later did with the gun he had been holding.

In another case, *People v. Creach* (1979), 69 Ill. App. 3d 874, 387 N.E.2d 762, the appellate court reversed a conviction, with one judge dissenting, in part on the ground that the court erred in refusing to give a compulsion instruction. The supreme court granted the State's petition for leave to appeal and affirmed on another ground, but expressly abstained from passing on the appellate court majority's holding that the compulsion instruction should have been given. (*People v. Creach* (1980), 79 Ill. 2d 96, 402 N.E.2d 228.) Neither side has cited *Creach*; and it would unnecessarily lengthen this opinion to recite the facts of that case. Suffice it to say that we agree with the dissenting opinion, which was cited with approval in *People v. Scherzer* (1989), 179 Ill. App. 3d 624, 645, 634 N.E.2d 1043.

█ We do not believe that the defendant's testimony here meets even the standard of "slight evidence" to require the giving of a compulsion instruction. As has been said in a case upholding refusal to give a necessity instruction, "[n]ot every remark is specific enough to rise to the level of a direct threat or be so dire a warning as to *reasonably* instill the degree of fear of impending harm claimed to necessitate [the] defendant's actions and require an instruction on necessity." (Emphasis added.) (*People v. James* (1989), 180 Ill. App. 3d 461, 465, 535 N.E.2d 1147, 1150.) The same observation may be made of a compulsion instruction.

The defendant and Stutts had been friends for the period of time they had lived in that neighborhood, 12 years. There is not one word from Stutts of "threat or menace of the imminent infliction of death

or great bodily harm." Instead, the defendant relies on his testimony that his friend "pointed" the shotgun at him and "told [him] to get in the driver's seat and pull off" to permit the inference that he *reasonably* believed his "friend" would shoot him if he did not do everything he was told. The defendant uttered not one word of protest and asked not one question. Even after the shotgun was discharged, the defendant's only questions were whether Stutts was injured and if Stutts wanted to be taken to a hospital. Moreover, the shotgun was later seized by Purdie, who threw it away; and the defendant took no steps at that time to assist Purdie, who was dragged by Stutts as he retrieved the shotgun; nor did the defendant attempt to flee. To borrow from *People v. Perez* (1981), 97 Ill. App. 3d 278, 281, 422 N.E.2d 945, a case holding that there was not even slight evidence to justify a finding of necessity, "[s]imple common sense conjoined with the record in this case prohibits the conclusion" that the defendant's testimony was sufficient to establish that Stutts' conduct constituted a direct threat or a dire warning that would reasonably instill in the defendant the degree of impending harm that would justify his actions in aiding and abetting Stutts.

■ Even assuming that the evidence was sufficient to require the instruction, no error occurred in its refusal for another reason. It must be noted that there are two separate time periods in the crime: before the defendant drove away from the forest preserve and after he returned with Marvin. The defendant testified that, after he returned with Marvin, there were no further beatings and Purdie, with her arms around Stutts, asked him if they could go to a motel. No threats of any kind were made against the defendant after he returned. Thus, if any crimes were committed after he returned, the defense of compulsion was admittedly not available to him. If the testimony of Purdie was to be believed, since she testified that, after Marvin and the defendant returned, she was still held prisoner and that Stutts had a gun, the jury would be justified in finding both Marvin and the defendant guilty of aggravated kidnapping. The fact is that the jury, understandably, did believe Purdie and not the defendant, as evidenced by the finding of guilty of Marvin. The evidence also established that Stutts continued to beat Purdie while Marvin drove to the motel and, therefore, supported a finding of aggravated battery against the defendant. See *People v. Ruiz* (1967), 82 Ill. App. 2d 184, 191, 226 N.E.2d 438.

■ Kidnapping is a continuing offense. (*People v. Turner* (1989), 128 Ill. 2d 540; *People v. Tate* (1981), 94 Ill. App. 3d 192, 418 N.E.2d 1048.) The kidnapping of Purdie was an ongoing crime and included

the period of time before and after the defendant left and returned. Therefore, the giving of this instruction, general in its terms and without limitation as to time, would have been confusing to the jurors, since it would have embraced acts to which it was admittedly not applicable.

■ Finally, even assuming that the instruction should have been given, any error in its refusal would be harmless. The evidence of guilt is so clear and convincing that the jury's verdict could not have been different. *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531; *People v. Bailey* (1986), 141 Ill. App. 3d 1090, 490 N.E.2d 1334.

■ The defendant next contends that error occurred when Purdie testified to statements made by Stutts and when Detective Dywer testified to statements made by Marvin. Neither Stutts nor Marvin testified. The defendant did not object to the testimony which he now assigns as error, nor did he refer to the testimony in his written motion for a new trial. We conclude that the defendant has waived this assignment of error. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ Even absent waiver, we judge that no reversible error occurred. Purdie testified that Stutts told her, "Oh, girl, what me and Bill are going to do to you tonight." That testimony was admissible for a number of reasons. First, our reading of the record leads us to conclude, contrary to the defendant's brief, that the statement was made in the presence of the defendant, who implicitly concurred by silence. Second, it was part of the *res gestae*. And third, it was a declaration made by a coconspirator in furtherance of the conspiracy.

■ The other alleged error occurred when Dwyer testified that after Marvin was arrested, Marvin told him that the defendant had come to his home after midnight, that Stutts had a sawed-off shotgun, and that he and the defendant abducted Purdie, that while driving to a deserted area during a struggle, the shotgun went off. The defendant tacitly recognizes, as he must, that the evidence was admissible against his codefendant, Marvin. Moreover, the statement attributed to him by Marvin is no different than his testimony. He admitted assisting Stutts in the abduction and that a shotgun was fired. Consequently, there was no prejudice to him. Last, we repeat that the evidence so overwhelmingly supports the verdict that the absence of this evidence could have had no effect on the outcome.

■ The defendant next argues that reversible error occurred during the State's closing argument. He contends that the argument distorted the law of accountability and ignored "specific intent." In

our judgment the prosecutor's argument was not improper; and we note specifically that he did not ignore the requirement of intent:

"And [the judge] is going to tell you a person is legally responsible for a conduct of another person when either or before the commission of an offense, *with the intent* to promote or facilitate the commission of the offense, the person knowingly aids, abets, agrees to aid or attempts to aid the other person in the planning and commission of the offense.

\* \* \*

And he is going to tell you that we have to prove that the defendant or somebody who he is legally responsible for, that the defendant did perform an act which [*sic*] a substantial step towards the commission of a murder. That is one. And that when he did so, *he intended* to commit the offense of murder.

\* \* \*

How many times did Tina tell you from the witness stand what Bryant told her, I'm going to kill you. You're done. This is it. You have had it. How many times did he tell her that? How do you determine *intent*? By what a person does and what a person says." (Emphasis added.)

The defendant also argues that he was improperly convicted of kidnapping, aggravated battery and unlawful use of weapons, because, he says, they are lesser included offenses of aggravated kidnapping. The State concedes that the conviction for unlawful use of weapons was an element in the conviction for aggravated kidnapping and it should be vacated, but does not concede that the convictions for kidnapping and aggravated battery should be vacated.

We agree that the conviction for aggravated battery should stand. The beating that Purdie received from the fists of Stutts and the blow from the shotgun were acts constituting aggravated battery and were separate from the act of forcing her into the car at gun point, which was the first step in the aggravated kidnapping. But we do not agree with the State that the kidnapping was not part of one continuous crime of aggravated kidnapping. The conviction for kidnapping, therefore, is vacated. See *People v. Turner* (1989), 128 Ill. 2d 540.

Last, the defendant maintains that his sentence should be reduced. In light of the brutal nature of the crimes, the defendant's callous participation in them and his apparent lack of remorse, as evidenced by his preposterous testimony which included the traducement of Purdie, we refuse to say that the trial court abused its discretion.

For these reasons, the judgments of conviction for aggravated

kidnapping and aggravated battery are affirmed. The convictions for kidnapping and unlawful use of weapons are vacated.

Judgment affirmed in part and vacated in part.

BILANDIC, P.J., and SCARIANO, J., concur.