THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE NEGRON, Defendant-Appellant.

First District (4th Division) No. 1—88—0864

Opinion filed September 30, 1991.—Rehearing denied November 15, 1991.

Randolph N. Stone, Public Defender, of Chicago (Julie M. Campbell and Thomas N. Swital, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant Jose Negron was convicted of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2(a)), and conspiracy to commit robbery. (Ill. Rev. Stat. 1987, ch. 38, par. 8—2.) He was sentenced to 22 years' imprisonment for the murder conviction, 22 years' concurrent incarceration for the armed robbery conviction, and 2 years' con-

current imprisonment for the conspiracy conviction. Defendant raises multiple issues upon review, challenging: (1) the trial court's denial of defendant's motion to suppress his inculpatory statements to police; (2) the trial court's decision to allow two juries to hear certain evidence pertaining both to defendant's trial and to the simultaneous trial of defendant's codefendants; (3) the trial court's admission into evidence of various testimony regarding defendant's involvement in the crime; (4) the trial court's exclusion of certain evidence offered by defendant in his defense at trial; (5) a remark by the prosecutor during closing argument to the jury; and (6) the sufficiency of the evidence against defendant to prove his guilt beyond a reasonable doubt. Defendant also argues that his conviction and sentence for conspiracy to commit robbery must be reversed, because he was also convicted for the offense of armed robbery. We affirm in part and reverse in part.

Defendant was tried and convicted for the murder and armed robbery of Frank Masic (Masic) that occurred on approximately February 15, 1987, in the victim's apartment in the City of Chicago. Prior to trial, the defendant moved to suppress his incriminating statements to authorities regarding his involvement in the incident. Following a hearing, the trial court denied defendant's motion to suppress. The evidence presented at the motion to suppress hearing is discussed below with respect to defendant's claim on appeal that the trial court's denial of his motion to suppress was against the manifest weight of the evidence.

Also prior to trial, the court allowed defendant's motion to sever his case from that of his codefendants, Edwin Marrero, Angel Gonzalez, and Isabelo Nieves. Nieves was tried separately in a bench trial, and Marrero and Gonzalez were tried jointly by a single jury. Defendant was tried separately by a single jury. However, the court permitted the State to present to both the defendant's jury and the Marrero-Gonzalez jury certain evidence that was common to these defendants.

The evidence heard by the defendant's jury and the Marrero-Gonzalez jury consisted of the following: On February 17, 1987, Chicago police officer Ellen Weiss testified that in response to a report that Masic was missing, she went to Masic's apartment but found no signs of forced entry. She also searched the area around the apartment building, unsuccessfully, for Masic's automobile.

The next day, Helen Rosenberg, who owned the apartment building in which Masic lived, gave the key to Masic's apartment to Brandecker, a maintenance worker at the apartment building, who unlocked the door to Masic's apartment. As the door opened,

Brandecker noticed that the wall was covered with blood. He closed the door to the apartment and the police were notified. Shortly thereafter, Brandecker opened the door to Masic's apartment for Officer Kenneth Kasal, who entered the apartment. Officer Kasal found a body lying in a pool of blood, notified his superiors, and remained in the apartment to preserve the scene.

Detective Carey Orr, who was in charge of the investigation, arrived on the scene and found that the apartment was in disarray and that there was a great deal of blood on the floor and walls. He testified that Masic's body was found on the floor in the bathroom, with his front pants pockets pulled inside out. Detective Orr also noticed that the victim had a puncture wound in his neck. The detective testified that he learned that Masic owned a car with the license plate FM 2004.

The following day, on February 19, 1987, Officer Kathleen Butzen received a call regarding a grey 1986 Chevy Celebrity with the license plate number FM 2004. She located the car near Sawyer and Emmett Streets in Chicago, and contacted the appropriate police personnel. Officer Frank Kajari and Detective Thomas Sappanos inspected the automobile and found that the license renewal indicated the car was owned by Masic. They also found that the trunk was empty and that there was no spare tire in the automobile.

Dr. Jo Ann Richmond, a forensic pathologist who performed the autopsy, testified that in her opinion, Masic died due to bleeding from five stab wounds, especially since one of the wounds pierced the jugular vein and voice box. Because of the extent of decomposition of the body, Dr. Richmond indicated that Masic probably died closer to February 14, 1987, the last date on which Masic was seen alive, although his body was found four days later, on February 18, 1987.

After the State presented this common evidence to both the defendant's jury and the Marrero-Gonzalez jury, the State offered the following evidence regarding the defendant's involvement in the Masic armed robbery/murder. This evidence was heard solely by the jury empaneled to determine defendant's guilt.

Efrain Sanchez Rivera (Rivera) testified that after he joined the Spanish Cobras gang in January 1986, he began selling marijuana for "Fat Man," who lived at Sawyer and Emmett Streets in Chicago. Rivera would keep a certain amount from each sale and give the remainder to "Fat Man" or "Blonco." Rivera identified "Blonco" in court as the defendant.

Rivera stated that in mid-February 1987, he was dealing marijuana outside "Fat Man's" apartment. He saw a grey car parked out-

side the apartment, and two members of the Spanish Cobras, "T.C." and "Tony Armor," near the car. Rivera then saw "Fat Man" exit the driver's side of the car, and saw defendant, along with other persons known to Rivera as "Poppo," "Little Man," and "Tuffy," get out of the car. "Fat Man" gave Rivera the keys to the apartment and told Rivera to go upstairs to bag marijuana. Rivera did as he was directed.

After Rivera had been in the apartment for 10 or 15 minutes, he went to the living room window and saw "Poppo" and "T.C." open the trunk to the grey car and take out a spare tire. "Fat Man" took off his jacket and Rivera noticed that the T-shirt "Fat Man" was wearing appeared to have blood smeared on it. Rivera saw "Fat Man" remove the T-shirt and place it in the rim of the tire. Rivera then saw "Fat Man" walk with "T.C." and "Poppo," who were carrying the tire, to the gangway where a dumpster was located. Rivera heard a slam and saw "Poppo" and "Fat Man" walk back to the apartment. The pair then entered the living room and began talking. Rivera heard "Poppo" ask "Fat Man," "Why did you stab the man, like that?" Rivera asked them "what man[?]" and "Poppo" responded that it was "none of your [Rivera's] *** business." Thereafter, "Poppo" told "Fat Man" to "get the little shorty out of here," and "Fat Man" told Rivera to go eat something. Rivera left the apartment and went home, passing the grey car that he had seen defendant and the others exit shortly before. He noticed that the automobile was a four-door Chevrolet with a license plate that began "FM 2."

Rivera returned to "Fat Man's" apartment building the following afternoon. At that time, Rivera noticed that there were police around the grey car. He did not tell the police what he had seen or heard, since he was scared, he thought a "contract" would be put out on him and his family if he spoke to the police, and he had marijuana in his possession.

The police questioned Rivera regarding the Masic murder in June 1987, and he revealed in substance the circumstances to which he similarly testified at trial. This statement was reduced to writing and signed by Rivera. Rivera also testified before a grand jury regarding what he had seen and heard in February 1987.

Rivera admitted at trial that he also had given statements to the assistant public defenders who represented "Fat Man" and "Poppo." These statements were substantially different than the statements Rivera made to officers of the Chicago police department and to the grand jury. The record does not contain a transcript of Rivera's statements to the assistant public defenders. However, at trial, Rivera acknowledged that he told the assistant public defenders that he had

lied to police about what he had seen and heard in February 1987 regarding the Masic armed robbery/murder.

In addition, Rivera testified at trial that he lied to the assistant public defenders with respect to what he had witnessed in February 1987 because he was afraid that a "contract" would be put out on him by "Fat Man," "Poppo," "Little Man," or "Tuffy." Rivera knew at that time that all of these individuals, with the exception of "Tuffy," had already been arrested for the Masic armed robbery/murder. Rivera admitted that at the time he made his statements to the assistant public defenders, he was on probation, had previous convictions for robbery, burglary, and sexual assault, and also had a pending robbery case. Rivera further acknowledged that his father, who was present when he made his statements to the assistant public defenders, was being represented by the public defender's office on a "sawed-off shotgun" case.

The State also presented testimony regarding inculpatory statements defendant made during police questioning regarding the Masic armed robbery/murder. Officer William Rose testified that in June 1987, he noticed defendant outside a house at approximately 1543 North Talman. The officer had been advised to find several individuals, including defendant, to determine if they would voluntarily cooperate in the investigation. Officer Rose spoke to defendant, who agreed to go to the police station. Defendant asked what the police wanted to discuss and was informed that the investigation pertained to a homicide.

When they arrived at the station, defendant was turned over to Lieutenant Edward Kijowski. The lieutenant introduced defendant to Detective Thomas Blomstrand as one of the detectives assigned to the homicide. Following the introduction, defendant defecated in his pants and was allowed to use a washroom. Thereafter, he was taken into an interrogation room with Detective Blomstrand and Detective Patrick Flynn, who were working together on the Masic incident. Defendant told the detectives that he "wanted to tell the truth about the white man who had been stabbed in February of last year, '87."

Detective Flynn advised defendant of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant responded that he understood after each sentence what was read to him regarding these rights. Defendant waived his *Miranda* rights and agreed to discuss the Masic incident with the detectives. Defendant identified Masic in a photograph as the person whom his friends had stabbed with a kitchen knife. Defendant also

identified Masic's car as the one his friends had been driving with Masic.

Defendant explained that on the day of the incident, he saw his friends driving Masic's car. Masic was in the automobile with defendant's friends. Defendant identified these friends as "Fat Man" (Edwin Marrero), "Tony Armor" (Harry Rodriguez), "Poppo" (Angel Gonzalez), "Tuffy" (Jaime Ruiz), "Little Man" (Isabelo Nieves), and "T.C." (Rudy Ramirez). Defendant said that everyone exited the automobile and went into an apartment. Thereafter, "Poppo" said that "the old boy [Masic] had money which maybe we should take him back to his place and get his money." The group left in Masic's car, while defendant followed them on a motorcycle. When they reached Masic's apartment, "Tony Armor" and "Poppo" went into the apartment with Masic. "Tony Armor" then let the others into the apartment a short time later.

When defendant reached the apartment, he heard "Poppo" demanding money of Masic. Defendant saw "Tony Armor" grab a knife, and "T.C." hold Masic's arms while "Tony Armor" stabbed the victim. Defendant testified that Masic asked them to "take all my stuff but please don't kill me." "Fat Man" then "screamed" at "Tony Armor" and took the knife. "Tony Armor" took the victim's watch from his wrist while the others searched the apartment for items of value to take. "Fat Man" then told defendant and "Little Man" to go outside and watch for the police. Defendant stated that he could hear Masic "screaming" as defendant left the apartment. Thereafter, everyone except Masic came out of the apartment and drove away in Masic's car.

Defendant gave a subsequent oral inculpatory statement to Assistant State's Attorney Diane Meyer and Detective Blomstrand. Both Assistant State's Attorney Meyer and Detective Blomstrand testified at trial regarding this statement, in which defendant gave a substantially similar account of the incident. Following his second oral inculpatory statement, defendant initially agreed to give a court-reported statement. However, he later changed his mind and requested an attorney. Because of his request for counsel, defendant was not questioned further by the authorities regarding his involvement in the Masic homicide.

In his defense, defendant presented the testimony of his mother, Anna Rodriguez (Rodriguez), who testified that defendant was 18 years of age, could not read or write, and took special education classes. Rodriguez stated that defendant did not own a motorcycle and that she had never seen him driving a motorcycle.

Thereafter, the defense proceeded by stipulation that none of the fingerprints from Masic's apartment matched those of defendant or the other defendants and that Detective Orr distributed a flyer regarding a $10,000 reward offered in this case during the early part of March 1987. A police search of Masic's apartment revealed $409 in currency.

Based upon this evidence, the jury found defendant guilty of murder, armed robbery, and conspiracy to commit robbery. The trial court denied defendant's motion for a new trial, and sentenced him to 22 years' imprisonment for the murder conviction, a concurrent 22-year term for the armed robbery conviction, and a concurrent 2-year term of incarceration for the conspiracy charge. Defendant's appeal followed.

I

Defendant argues that the trial court erred when it denied his pretrial motion to suppress his incriminating statements. He claims that the trial court's determination that his statements were voluntary is against the manifest weight of the evidence.

At the hearing on defendant's motion to suppress, Officers Palasz and Rose testified that they had been advised to locate several individuals, including defendant, to ask for their voluntary cooperation in the investigation of the Masic armed robbery/murder. The officers stated that at approximately 2 a.m. on June 25, 1987, they noticed defendant outside a home on North Talman. They asked defendant to talk to investigating officers regarding an armed robbery/murder, and defendant agreed, stating that he knew "nothing about anyone getting killed." Defendant voluntarily accompanied the officers to the stationhouse for questioning. When they arrived at the police station, Officers Palasz and Rose turned defendant over to Lieutenant Kijowski. The officers stated that defendant was not handcuffed, and that they did not strike the defendant or make any misrepresentations to him regarding the investigation.

Lieutenant Kijowski testified that he met defendant upon defendant's arrival at the station with Officers Palasz and Rose. Lieutenant Kijowski introduced defendant to Detective Blomstrand, who was investigating the incident. Immediately after this introduction, defendant defecated in his pants, and the officers directed defendant to a washroom. Defendant exited the washroom after approximately five minutes and told Lieutenant Kijowski and Detective Blomstrand that he wanted "to tell you all about what happened right now."

Detective Flynn, who was working with Detective Blomstrand, joined Detective Blomstrand and escorted defendant to a conference room. Detective Flynn advised the defendant of his *Miranda* rights. Defendant responded that he understood each right and that he "wanted to tell the truth." Defendant then made a statement regarding the homicide that took approximately 15 to 20 minutes. According to the officers, defendant never indicated that he wanted to remain silent or that he wanted an attorney. Both detectives testified that defendant was not physically coerced and that they made no misrepresentations to him during the interrogation. Following defendant's inculpatory statement, the detectives left the room.

Later, at approximately 10:15 a.m., Detective Blomstrand and Assistant State's Attorney Diane Meyer returned to interview defendant. The assistant State's Attorney informed defendant of his *Miranda* rights. Defendant stated that he understood each right, and agreed to talk about the incident. Defendant then made an incriminating statement that lasted approximately 15 to 20 minutes. During the interview, defendant did not indicate that he wanted to remain silent or speak to an attorney. Both the assistant State's Attorney and the detective testified that defendant was not struck, that no misrepresentations were made to defendant, and that he was not told that others had implicated him in the investigation.

When defendant completed his oral statement, Assistant State's Attorney Meyer asked if defendant would make a court-reported statement. Defendant responded that he would. The assistant State's Attorney left the room to find a court reporter. When she returned in the company of a court reporter, defendant informed her that he wanted to see a lawyer. Defendant was not questioned further by authorities.

Rodriguez, defendant's mother, testified in his defense. She stated that defendant was enrolled in special education classes and did not comprehend when spoken to. Initially, Rodriguez stated that defendant would tell her when he did not understand something. Later, she testified that defendant would not answer if he did not understand.

Mirabel Bermudez (Bermudez), defendant's sister, stated that she saw defendant enter a dark blue police car parked on Talman at approximately 2 a.m. on June 25, 1987. Someone told her that defendant was being taken in for questioning and would return shortly. Bermudez waited at the location until 3:30 a.m., and then began searching for defendant. She drove to a police station, and, while sitting at a street light, saw her brother sitting in the back seat of a dark blue detective's car near the station. It was approximately 8

a.m. Bermudez testified that she ran toward the automobile and told the officers that she was defendant's sister. A detective responded that defendant was being taken in for questioning, and Bermudez saw the officers place handcuffs on the defendant. Bermudez testified that defendant was pale, his nose was bleeding, and there was dried blood on his shirt. Bermudez also testified that defendant did not comprehend when spoken to and had to be addressed as though he were a child.

In rebuttal to defendant's evidence at the motion to suppress hearing, Officers Rose and Palasz testified that defendant was only in their squad car, which was light blue in color, when they met defendant at approximately 2 a.m. and drove him to the police station. The officers testified that at approximately 7 a.m., they were transporting another person, Harry Rodriguez, to the station, and that they remained at the station until 9 a.m. Officer Palasz testified that he did not see defendant's sister that morning.

Detectives Flynn and Blomstrand testified that defendant was under arrest after 2:45 a.m. following his inculpatory statements, and that defendant was not thereafter removed from the police station. Detective Flynn asked defendant if he wanted anything during the early morning hours, but defendant refused. Detective Blomstrand also offered food, which defendant declined.

The parties stipulated that a paramedic at Cook County Jail conducted a physical examination of defendant on June 26, 1987, and noted no injuries on the defendant. It was also stipulated that the defendant told the paramedic that the defendant did not have any complaints regarding his police custody. A photograph of the defendant, taken on June 26, was introduced and admitted into evidence.

Frank Marino, an assistant Cook County public defender who represented a codefendant, testified that he talked to Bermudez on October 21, 1987. Marino did not recall Bermudez informing him that she saw her brother get into a car at 2 a.m. According to Marino, Bermudez simply advised him that she saw defendant in the morning at the police station.

The trial court determined that, given the totality of the circumstances, the defendant's statements to authorities were given voluntarily. As a result, the trial court denied the defendant's motion to suppress.

A defendant's statement is involuntary if the evidence reveals that his will was overborne at the time the statement was made. (*People v. House* (1990), 141 Ill. 2d 323, 566 N.E.2d 259.) In order to determine whether a statement was voluntary, the trial court must con-

sider the totality of the circumstances surrounding the making of the statement, including such factors as the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment. (*People v. Terrell* (1989), 132 Ill. 2d 178, 547 N.E.2d 145.) A trial court's determination that a defendant's statement was voluntary is subject to reversal on appeal only if the record shows that this finding was against the manifest weight of the evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.

■ Based upon a review of the record, we find no sound basis to disturb the trial court's conclusion that defendant's incriminating statements to authorities were voluntary. The evidence discloses that defendant agreed to accompany the police to the stationhouse at approximately 2 a.m. on June 25, 1987. When at the police station, at approximately 2:30 a.m., defendant was advised of his *Miranda* rights, acknowledged that he understood these rights, and waived his *Miranda* rights prior to police questioning. Defendant told Chicago police detectives of his involvement in the Masic armed robbery/murder. Thereafter, at approximately 10:15 a.m., defendant was questioned by an assistant State's Attorney, who began by advising defendant of his *Miranda* rights, which defendant waived prior to his discussion with the assistant State's Attorney. Although defendant initially agreed to give a court-reported statement, he then changed his mind and requested counsel. He was not questioned further regarding his involvement in the incident. The record shows that defendant was not threatened, coerced, or deceived into making his incriminating statements and that he was offered food and drink while held by the authorities. Given these considerations, we conclude that the record supports the trial court's determination that defendant voluntarily made incriminating statements to authorities regarding his involvement in the Masic armed robbery/homicide.

Defendant points to particular circumstances surrounding his interrogation to demonstrate that his incriminating statements could not have been voluntary. The trial court considered these matters, yet determined that defendant's statements were voluntary. We cannot say that the isolated circumstances upon which defendant relies are adequate basis to reverse the trial court's factual determination based upon the totality of the circumstances surrounding defendant's inculpatory remarks.

Specifically, defendant contends that his statements could not have been voluntary, because he had defecated in his pants when he

first entered the stationhouse and had to remain in soiled clothing during subsequent police interrogation. The record does not disclose that defendant complained to the officers, or that defendant requested medical treatment, or that defendant even asked for a change of clothing. During the interviews with authorities, defendant was fully informed of and waived his *Miranda* rights, and then gave his incriminating remarks. On these facts, we cannot say that the defendant's will was overborne when he made his incriminating comments.

Defendant also claims that his statements were not voluntary, because the evidence presented at the motion to suppress hearing revealed that defendant was of low intelligence, was educably mentally handicapped, and had poor oral and written comprehension. The intelligence of the defendant is not controlling, but is only one factor relevant to a determination of whether the defendant's statements were voluntary. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958; *People v. Reid* (1990), 136 Ill. 2d 27, 554 N.E.2d 174.) It is also noteworthy that defendant requested counsel following his oral statement to the assistant State's Attorney. In view of this request, we are unable to find that defendant was unable to comprehend his waiver of *Miranda* rights or that his decision to speak to authorities was otherwise involuntary.

In addition, defendant notes that according to the testimony of his sister, Bermudez, defendant was physically assaulted by authorities during police questioning. The trial court did not give credence to the testimony of defendant's sister, which was contradicted by the testimony of the police officers. Upon review, we cannot say that the trial court erred when it found the police officers' testimony more credible than that of defendant's sister.

For the reasons stated above, we find defendant's arguments insufficient ground to reverse the trial court's denial of defendant's motion to suppress his inculpatory statements.

## II

The defendant maintains that the trial court committed reversible error when it allowed his jury to hear certain common evidence also being simultaneously presented to the Marrero-Gonzalez jury.

The trial court is empowered to hold partial, simultaneous trials of multiple codefendants. (Ill. Rev. Stat. 1987, ch. 38, par. 114—8.) Such a procedure is "permissible provided the defendant is given every opportunity to present a complete defense to his own jury, there is no event which confused the jury or affected its ability to render a fair decision, and the record shows that the jurors were adequately

prepared for the procedure. [Citation.]" *(People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1089-90, 502 N.E.2d 304.) Also, "[a]bsent a showing of prejudice, a reviewing court will not speculate as to any impropriety in the procedure. [Citation.]" *Johnson,* 150 Ill. App. 3d at 1090.

■ According to the record in the instant cause, the defendant's jury and the Marrero-Gonzalez jury were selected from separate venires. Separate opening statements were made to each jury. Also, both juries were present in the courtroom only when the State offered evidence relevant to defendant, Marrero, and Gonzalez. Thereafter, the Marrero-Gonzalez jury was excused, and the defendant's jury heard only evidence relevant to the cause against defendant. Separate closing arguments were made to each jury, and each was given separate instructions. The trial court repeatedly advised the defendant's jury of the nature and purpose of the procedure it adopted, and informed the jury that it should consider the evidence only as it affected the determination of defendant's guilt. Under these circumstances, we cannot say that the procedure adopted by the trial court amounted to an abuse of discretion.

Defendant claims that this procedure prejudiced his defense at trial, because it suggested to his jury that all of the defendants must have been involved in the crime. It was primarily the defendant's incriminating statements that revealed to the jury the multiple defendants' joint participation in the crime, however. As a result, the procedure followed by the trial court did not improperly suggest to the jury that the various defendants had jointly participated in the Masic armed robbery/murder.

■ Defendant also asserts that given the procedure adopted by the trial court, his jury should have been advised that both Marrero and Gonzalez were acquitted of the Masic armed robbery/murder. Evidence that another defendant has been acquitted is admissible when the State's case against both defendants is identical. *(People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Winchell* (1987), 159 Ill. App. 3d 892, 512 N.E.2d 1298.) The evidence against defendant was not identical to that admitted against Marrero and Gonzalez; it was this lack of identity that required the procedure followed by the trial court in the case at bar. Because of this lack of identical evidence against the various defendants, we find no error in the trial court's refusal to inform defendant's jury that defendants Marrero and Gonzalez were acquitted of the Masic armed robbery/murder.

## III

Defendant challenges the trial court's admission into evidence of

various testimony from State witnesses regarding defendant's involvement in the Masic armed robbery/murder.

Specifically, the defendant claims that he was deprived of a fair trial when the State was permitted to elicit testimony from Rivera to the effect that Rivera sold drugs for defendant and "Fat Man." The record indicates that defendant did not object to this testimony at trial. Defendant also argues that the trial court erred in allowing Rivera to testify that he had made prior consistent statements to the police regarding what Rivera had seen in February 1987 with respect to the Masic armed robbery/murder. However, defendant did not raise this issue in his post-trial motion for a new trial.

■ It is well established that, in order to preserve a question for review, the defendant must raise his objection both at trial and in a post-trial motion for a new trial. If defendant fails to object, or if he fails to preserve the question in his motion for a new trial, the issue is waived on review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Because defendant did not properly raise his objections to these portions of Rivera's testimony, we need not consider these matters in this appeal.

The defendant's arguments with respect to these aspects of Rivera's testimony may be reviewable according to the plain error rule. (107 Ill. 2d R. 615(a).) "The plain error doctrine may be invoked in criminal cases to review an error which has not been properly preserved for review (1) where the evidence is closely balanced, or (2) where the error is of such magnitude that the defendant was denied a fair trial. [Citation.]" *People v. Nitz* (1991), 143 Ill. 2d 82, 108, 572 N.E.2d 895.

In our view, any alleged error in the admission of these challenged portions of Rivera's testimony did not deprive defendant of a fair trial. The evidence against the defendant was not closely balanced. Defendant gave two incriminating statements admitting to his participation in the Masic armed robbery/murder. The condition of the crime scene, and the fatal wounds inflicted upon the victim, corroborated defendant's statements that Masic had been murdered and robbed with a deadly weapon. In light of these circumstances, admission of the testimony from Rivera which defendant questions upon review did not amount to plain error. See *People v. McGee* (1987), 160 Ill. App. 3d 807, 513 N.E.2d 885; *People v. Borges* (1984), 127 Ill. App. 3d 597, 469 N.E.2d 321.

Defendant also claims reversible error in Rivera's testimony that Rivera heard "Fat Man" and "Poppo" discussing the Masic armed robbery/murder. In addition, defendant contends that Rivera should

not have been permitted to testify that his father had a "sawed-off shotgun" charge pending against him, or that Rivera's father was being represented by the public defender regarding this charge.

Defendant asserts that this testimony was inadmissible hearsay. The admission of hearsay evidence is harmless error when there is overwhelming evidence of defendant's guilt and no reasonable possibility that the jury's verdict would have been different if the hearsay had been excluded. *People v. Miles* (1988), 176 Ill. App. 3d 758, 531 N.E.2d 891.

■■ We conclude that any alleged error in admission of this testimony was harmless. The defendant was not referred to in the discussion between "Fat Man" and "Poppo." The circumstances surrounding Rivera's father's representation in a criminal matter by the public defender were not directly pertinent to the elements of the offenses for which defendant was charged. In addition, as stated above, there was substantial evidence of the defendant's guilt. Thus, we cannot say that the jury's verdict would have been different if the testimony had been excluded. See *People v. Phillips* (1989), 186 Ill. App. 3d 54, 541 N.E.2d 1298; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733; *People v. McInnis* (1980), 88 Ill. App. 3d 555, 411 N.E.2d 26.

■■ Lastly, defendant claims reversible error in the State's elicitation of testimony to the effect that after defendant made his inculpatory statements, Detective Blomstrand told Officer Rose to arrest the remaining defendants because defendant's statements gave the officer probable cause for these arrests. The trial court promptly sustained the defendant's objection to this testimony, and thereby cured any potential prejudice to the defendant in this regard. (*People v. Paino* (1985), 137 Ill. App. 3d 645, 484 N.E.2d 1106.) As a result, defendant's argument on this point is insufficient ground to grant him a new trial.

IV

Defendant also contends that the trial court's exclusion of certain evidence offered in his defense deprived him of a fair trial.

First, defendant claims that the trial court should have permitted him to present evidence to the jury showing that, after defendant gave his inculpatory statements and was charged for the Masic armed robbery/murder, Chicago police officers went to the defendant's home to ask defendant's mother to persuade him to testify against the codefendants. Defendant also asserts that he should have been allowed to elicit testimony proving that an assistant State's Attorney had, with-

out notice to defense counsel, attempted to persuade the defendant to testify against his codefendants.

■ Defendant asserts that this evidence was significant because it substantiated his defense theory that the police and prosecutors were willing to claim that defendant made incriminating statements, which defendant in fact never made, in their efforts to persuade defendant to "turn State's evidence." Generally, evidence is admissible when its probative value outweighs any prejudicial impact upon the jury. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) We cannot say that the excluded testimony was probative of whether the police fabricated defendant's incriminating statements. There is nothing in the record to indicate that the police or the assistant State's Attorney, when they attempted to persuade defendant to testify against the other defendants, ever acknowledged or implied that defendant's incriminating statements were fabricated. Consequently, we find no reversible error in the trial court's ruling.

■ Defendant also argues that the trial court should have permitted him to present evidence that the police authorities wanted to question Rivera because Rivera's name appeared on a police list of "known fruit hustlers." The trial court excluded this evidence because it determined that its probative value was outweighed by the prejudicial effect that would result from disclosure of the apparent sexual orientations of Rivera and the victim. We can find no abuse of discretion in this ruling. See *Gonzalez*, 142 Ill. 2d 481.

■ Defendant argues that the trial court should have permitted the jury to consider, during its deliberations, the tape of Rivera's statements to assistant public defenders regarding what Rivera saw in February 1987. It is within the trial court's sound discretion to determine whether evidence should be submitted to the jury during its deliberations. (See, *e.g., People v. Rogers* (1988), 123 Ill. 2d 487, 528 N.E.2d 667; *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220.) In the case at bar, the trial court concluded that allowing the jury to rehear the tape of Rivera's statements would have "unduly highlight[ed] [the testimony] of that witness who was lengthy on direct and cross while he was on the stand." Moreover, the court decided that it would consider sending the tape back to the jury should the jury request it. Given these circumstances, we find no error in the trial court's ruling.

## V

■ Defendant contends that he was deprived of a fair trial when the assistant State's Attorney remarked, during rebuttal closing argu-

ment, that the defendant's theory of innocence was not credible because "[w]ho testified other than the stipulations on behalf of the defense that other ***." The trial court promptly sustained defendant's objection to the prosecutor's remarks. By so doing, the trial court cured any prejudice accruing to defendant from this comment. (See *People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) Also, the trial court instructed the jury *inter alia* that (1) closing argument should not be considered evidence, and (2) the defendant's decision not to testify should not be considered against the defendant in determining whether he was guilty of the offenses for which he stood trial. In light of these considerations, the single remark by the prosecutor did not cause substantial prejudice to the defendant and is insufficient ground to grant him a new trial. See *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.

## VI

Defendant argues that the evidence against him was insufficient to prove him guilty beyond a reasonable doubt of murder and armed robbery. Because defendant's conviction for conspiracy is vacated below, we do not consider the sufficiency of the evidence with respect to this charge.

The standard of review for a defendant's reasonable doubt argument is well established. On appeal, our inquiry is limited to whether the evidence, when considered in the light most favorable to the State, supports the jury's determination that defendant was guilty of the armed robbery and murder of Masic. It is not the province of this court to reweigh the evidence or resolve conflicts in the testimony of the witnesses. Rather, we must decide whether the State's evidence is so unsatisfactory or improbable that there remains a reasonable doubt of the defendant's guilt. See *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.

Applying these principles, we find the State's evidence sufficient to support the determination that defendant was guilty of the Masic armed robbery/murder. According to defendant's two incriminating statements, defendant participated with the other defendants in going to Masic's apartment with the intent to rob the victim. When they arrived at the apartment, defendant stood watch while other defendants robbed and killed Masic. Defendant's incriminating statements were corroborated by the condition of Masic's apartment, which revealed that Masic had been stabbed by a knife and that the apartment had been ransacked with the intention of taking items therefrom. (See *People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d

845.) Consequently, the State's evidence amply justified the jury's verdicts in the instant cause.

## VII

 Defendant correctly asserts that his conviction for conspiracy to commit robbery should be reversed, because he was also convicted for the offense of armed robbery. A person cannot be convicted of both an inchoate offense and the principal offense. (Ill. Rev. Stat. 1987, ch. 38, par. 8—5; *People v. Walker* (1981), 84 Ill. 2d 512, 419 N.E.2d 1167.) Consequently, we reverse defendant's conviction for conspiracy to commit robbery and the sentence imposed therefor.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Pursuant to the State's request and in accord with *People v. Nicholls* (1978), 71 Ill. 2d 166, and *People v. Agnew* (1985), 105 Ill. 2d 275, we hereby assess defendant $75 as costs for this appeal and incorporate it as part of our judgment.

Affirmed in part; reversed in part.

JIGANTI, P.J., and LINN, J., concur.