Sixth Division
February 26, 2010

No. 1-07-3374

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 05 CR 18294 |
| | ) | |
| EDWARD LEAK, JR., | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Diane G. Cannon, |
| | ) | Judge Presiding |

JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant, Edward Leak, Jr., was found guilty of first degree murder and of having procured another to commit that murder for money. Defendant was subsequently sentenced to a term of 75 years' imprisonment. On appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred by failing to declare a mistrial when an assistant State's Attorney testified that defendant invoked his right to counsel; (3) the trial court abused its discretion by prohibiting defendant from cross-examining a witness regarding her alleged bias; (4) the trial court erred by allowing testimony as to hearsay statements made by a coconspirator; and that (5) the court erred by conducting a simultaneous but separate jury trial with a codefendant. For the reasons that follow, we affirm.

Prior to trial, the court determined that defendant would be tried along with his co-defendant, John Brown, in simultaneous but separate jury trials. The court also granted a motion *in limine* filed by the State seeking to allow Alfred Marley, another alleged coconspirator, to testify to statements made by Brown pursuant to the coconspirator exception to the rule against hearsay.

The following evidence was presented at defendant's trial.

John McCall testified that he was the general manager of the Leak and Sons funeral home and that he had worked with defendant, who was a Chicago police officer and who had been a director at the funeral home for 15 years. McCall also knew the victim in this case, Fred Hamilton, who worked as a dispatcher at the funeral home from 1996 to 2003. McCall testified that the victim left the funeral home because funds were discovered missing and the victim had access to "some checks, they were cashed and he cashed them or we assumed he did." The victim, however, was technically not fired because he left the day that McCall and others began to investigate the missing funds. McCall testified that the victim subsequently contacted him and made certain allegations against defendant. On cross-examination, McCall testified that he did not tell defendant of the allegations that the victim made against him and that, after the victim left the funeral home, defendant filed a complaint against the victim with the police department regarding the missing funds.

Corey Ankum testified that he worked at defendant's family's funeral home from 1998 to 2000 and that defendant and the victim also worked there during that time. In late 2003 or early 2004, after the victim no longer worked at the funeral home, defendant approached Corey in a nightclub and asked him if he had seen the victim. Corey replied that he was "not here for that." Defendant then said, "when I see that mother fu---- I'm going to kill him." Finally, Corey testified that he was interviewed by the police in 2005 and that he told them that defendant said something to the effect of "I'm going to kill Fred, tell your boy I'm looking for him, I'll kick his a--."

Ned Hamilton, the victim's brother, testified that he had an encounter with defendant in the fall of 2003. Defendant came to the restaurant where Ned worked and asked if he had seen the victim. Ned responded that he had not and defendant said, "tell your brother that I'm looking for him. I know a lot of people out here and we gonna get him."

Michelle Stokes testified that she dated defendant during the late months of 2003 and the early months of 2004. Stokes testified that she lived in an apartment above her nephew from 2001 to 2004 and that she met Brown through her nephew in early 2004. Stokes saw Brown in her nephew's apartment and also testified that defendant had been in her apartment. According to Stokes, the only time defendant had been in her nephew's apartment was when her nephew cut defendant's hair, although she testified that defendant knew both of her nephews and that he would talk to them.

Charmain Ankum, Corey Ankum's sister, testified that she was the victim's girlfriend and that they had one child together, Jaylin Hamilton. In the summer of 2003, Charmain learned that the victim was fired from the funeral home and she testified that he thereafter began to act "paranoid" and "scared of certain things," such as "phone calls" and "people." Around Thanksgiving of 2003, Charmain saw defendant circling the house in which she and the victim lived. She recognized defendant's vehicle and its personalized license plates, which said "drop cop," because on several occasions she had seen defendant getting out of that car in front of the funeral home where he and the victim both worked. She related this information to the victim.

On February 3, 2004, Charmain spent the day with the victim at the daycare center where she worked. At approximately 6:30 p.m., Charmain and the victim were leaving the daycare

3

center when Charmain noticed a brown van with a beige stripe and a broken headlight parked across the street from her vehicle. Charmain could not see inside of the van because it had tinted windows. Charmain testified that it was dark outside at the time and that there was snow on the ground. When Charmain and the victim got to her car, Charmain noticed "an antenna of some sort" sticking out of the vehicle's front passenger tire. The victim also looked at the tire and then he and Charmain walked back to the daycare center and called for a tow truck. When the tow truck company called to say the tow truck was in the area, Charmain and the victim left the daycare center and the victim asked Brian Miller, who also worked at the daycare center, to accompany them to the car because the victim was concerned about the brown van. The victim got into the tow truck and rode to Charmain's car while Charmain and Miller walked in that direction. The victim pulled the car into the street so it could be loaded onto the tow truck and then Charmain observed the brown van circling the block and asked the victim if he had seen it as well. The victim asked Charmain if she could see the license plates, but she could not because the van was too far away. The victim then walked over and stood in front of Charmain and Miller.

The victim subsequently looked down the block and then told Miller and Charmain to "walk away" and "run" because "it doesn't look right." A man then came from a nearby gangway, bumped into Charmain, and went directly toward the victim while pulling a black gun out of his pocket. Charmain described this person as wearing a black ski mask that covered his face, gloves, mustard colored pants, and a black jacket. The armed man fired three or four shots at the victim as he chased the victim around the tow truck. The shooter knelt over the victim, who was trying to shield himself by climbing under a car, and then rolled the victim onto his back.

4

The victim was saying, "no," "don't shoot me, don't do this," and "just go back and tell him I'm sorry," and then the armed man shot him again. Charmain and Miller turned and ran away and Charmain turned and saw the man shooting the victim again. Charmain called the police as she was running away and heard more shots when she got to the corner of the street. She hailed a cab and was driven back to the scene, where the police had already arrived. The paramedics were trying to resuscitate the victim, but he died at the scene. Charmain was later taken to the police station, where she related these events to the police. She also identified the clothing worn by the man whom she saw shoot the victim.

On cross-examination, Charmain testified that she only saw one person shooting the victim but that she was on the side of a building when some of the shots were being fired and that she "wasn't really looking that way" because she was on the phone calling the police. She never saw the victim with a person named John Brown. Charmain also testified that the funeral home where defendant worked is several blocks away from the daycare center. After the victim's death, Charmain learned that there was an insurance policy on the victim and that defendant was the beneficiary. Charmain further testified that the victim drove various cars, including a Lexus, a Mercedes, and a Range Rover. After the victim died, Charmain also learned that the victim had obtained a life insurance policy on himself that would pay for the note on one of his vehicles.

Brian Miller testified to substantially the same sequence of events regarding the shooting as did Charmain. He added that he also noticed a small metal piece sticking into the front passenger-side tire of Charmain's vehicle. Miller also saw the victim throw the tow truck driver at the shooter and the shooter push the tow truck driver out of the way. As he and Charmain

were running away from the scene, Miller noticed somebody "running in the same direction through the gangway going parallel, like the same direction as us." This person looked like the person who shot the victim because he was wearing a black leather coat and a black, hooded sweatshirt. When he and Charmain stopped running away from the scene, Miller could still see this person standing with another man at the end of the alley behind a McDonald's. Miller could not tell what this person looked like compared to the other man because the two men were some distance away. One of the men, however, was taller than the other. Miller got into the cab with Charmain and did not see the two men again. Miller testified that there was an alley right behind the McDonald's and that the two were separated by a fence. He then got into the cab with Ankum and did not see the two men again. After being driven back to the scene, Miller walked in the direction of where he had seen the two men but did not see them. He was then stopped by the police and handcuffed and placed in a squad car and while this was happening he saw the same brown van in a nearby grocery store parking lot.

On cross-examination, Miller testified that as he and Charmain were running away from the scene and before they rounded a corner and were behind a building, he could see the scene and only saw one person shooting at the victim. After rounding the corner, he continued to run down the street and saw the man with the gun coming out of a gangway and running parallel to his position. He later saw that person standing in an alley with another man, but then got into the cab with Charmain and so he did not see what happened to these two men. Finally, Miller testified that the brown van was pulling out of the parking lot as he was stopped by the police and that it stopped momentarily as he was pointing it out to the police.

Ernest Sanders testified that he worked for a tow truck company and that, on the night of the murder, he received a dispatch to perform a tire change on a vehicle at 7947 South Prairie. He proceeded to that location, found the vehicle, and waited for approximately five minutes until he saw Charmain, Miller and the victim walking down the street. The victim entered Sanders' vehicle and the two drove around the block while Charmain and Miller walked toward the vehicle. The victim told Sanders that the front passenger tire was flat but Sanders inspected the tire and, although he found what looked like a straw sticking out it, determined that the tire was not flat. The victim told Sanders that someone had cut his spare tire and that he would feel more comfortable if the car was towed. From this point, Sanders testified to substantially the same sequence of events regarding the shooting as did Charmain and Miller, but added that the gun he saw in the shooter's hand was chrome.

James Davis testified that he was visiting his parents, who lived near the scene of the shooting, on the evening of February 3, 2004. Davis was watching television when he heard a diesel engine and saw a tow-truck out the window. Several minutes later, Davis heard two shouts of someone saying "hey hey," followed by what he believed to be two gunshots. Davis looked out the window and saw the victim lying on his stomach. The shooter was standing over the victim, who was still alive and had his arm raised while pleading, "don't shoot me, don't shoot me." The shooter then fired two shots into the victim and walked down a gangway. Davis moved to another portion of the house and soon saw someone who had the same build and appeared to have the same jacket as the shooter. This person, who was alone, exited the gangway, entered Davis's neighbor's yard, and then entered another alley until he was out of

sight. Davis went outside and unsuccessfully attempted to resuscitate the victim.

Alfred Marley testified that he pled guilty for his involvement in the victim's murder in exchange for a recommendation by the State's Attorney's office that he serve a term of 27 years' imprisonment and that no other promises were made to him in return for his testimony in this case. Marley also acknowledged that he had a felony conviction for possession of a controlled substance for which he received a three-year prison sentence and a prior burglary conviction for which he received a seven-year prison sentence.

According to Marley, he knew Brown "from the neighborhood" and used to spend time with him. Brown contacted Marley in January of 2004 and offered to pay him $1,500 for his help in performing "a hit" on someone. Brown said that the hit was for a police officer named "Ray." Brown also said that the money was to come from that police officer and he also "said something about [an] insurance policy." Marley agreed to do the hit with Brown. He did not know the identify of the intended victim at that time but subsequently learned that it was the victim in this case, Fred Hamilton. Marley further testified that he and Brown tried to shoot the victim in January of 2004 but that the gun jammed when Marley attempted to pull the trigger and he did not fire a shot.

On the day of the murder, Brown picked Marley up at his home in his blue van and they drove to the area of Charmain's daycare center. Brown parked his van near the daycare center and then he and Marley walked over to Charmain's jeep and Marley punctured the vehicle's tire. Marley testified that he did not remember what was used to puncture the tire, but that he thought it was a knife. Marley and Brown then walked around the block and waited for the victim to

return to the jeep. A maroon or red car pulled up to a corner and Brown said, "that's his guy right there." Brown and Marley walked toward that vehicle and "he said he was a police officer" so Marley did not get into the car but instead continued to walk right past it. Marley testified that the person in the maroon car was an African-American male but that he could not see the person's face.

While Brown was in the maroon car speaking to its driver, Randy, a friend of Marley's, pulled up in his two-toned Chevrolet van. Randy and Brown then walked down the street talking and when they returned Brown entered the maroon car while Marley and Randy got into Randy's car, which was parked in a parking lot across the street from the daycare center. They then waited for the victim to come out of the daycare center and walk to his car. Eventually Randy received a phone call and then told Marley that Brown said to "come on now" because the victim was walking out of the daycare center. Marley crossed the street behind the daycare center and walked down an alley in the direction of Charmain's jeep. Marley then heard "a bunch" of gunshots and soon thereafter saw a man running, who said to Marley that there was a man who ran out of a gangway and was shooting at another man. Marley continued to walk toward the jeep and saw the victim lying on the ground while Brown was moving in the nearby gangway. Marley shot the victim two or three times. Marley was asked if he meant to pull the trigger and shoot the victim, to which he replied, "not really. Just went off at the time. The point was going over there to shootin' [sic], yeah." Marley also testified that he shot the victim because he wanted to get paid.

Marley then walked toward the gangway and met with Brown, who was wearing a black

or blue coat and a ski mask. They walked toward a McDonald's parking lot where Brown said they were supposed to meet the police officer in the maroon car. Marley and Brown jumped a fence to get to the parking lot, but the man in the maroon car was not there so they walked toward the street. The police then pulled in front of them and a female and male officer each exited the squad car. Marley walked toward the squad car and Brown went down the alley. The police chased after Brown and Marley was able to get away. Marley threw his gun in the bushes and walked home. He did not see Brown after that night but learned the next day that he had been arrested. Marley was not paid for his participation in the murder, and he was picked up by the police on April 28, 2005, while he was at Randy's home working on a car.

Marley testified that after he was arrested, he spoke to Assistant State's Attorney (ASA) Robert Heilingoetter and gave a videotaped statement admitting his participation in the victim's murder. He did so prior to requesting an attorney, to pleading guilty, or to negotiating a recommended sentence with the State's Attorney's office.

On cross-examination, Marley testified that when he was released from jail in January or February of 2004, he used narcotics while he was on supervised release. Marley also was a member of street gang at one point prior to when Brown contacted him about doing the hit. Marley testified that Brown initially asked him to do the hit in January of 2004 and he said he would think about it and that Brown came to his house and picked him up in his car approximately one week later and brought the subject up again. Brown said the hit was on a man named Fred, and Marley agreed to participate. Marley did not know Brown was planning on killing the victim at that time. They drove until they saw the jeep and Brown gave Marley a gun

10

and told him to shoot the victim. However, the gun jammed and the victim got away. Marley further testified that he wore a dark blue coat with a hood and a hooded sweatshirt on the night of the murder. According to Marley, Brown gave him a knife to puncture the jeep's tire and Marley punctured the tire with the knife until he heard air coming out of it. Marley also testified that Brown gave him a revolver to use during the shooting and that Brown had an automatic weapon.

Chicago police officer Robert Walker testified that he was working on the night of February 3, 2004, and that at 8:30 p.m. he responded to a call that a person had been shot. Officer Walker and his partner, who were both in uniform and driving a marked squad car, proceeded to the area of 79th Street and King Drive and saw two men running from the same area in which the victim had been shot. The two men jumped a fence and continued to run through a McDonald's parking lot. Officer Walker announced his office and ordered them to stop. One of these men stopped running and walked toward the officer's squad car while the other turned and ran. Officer Walker pursued the man who turned and ran and eventually caught him hiding behind a car in an alley. He ordered the man to lie on the ground and observed a black ski mask and a cell phone within a "couple of inches" of him. Officer Walker identified this person as Brown and testified that he was also wearing a black leather jacket and black gloves. He handcuffed Brown, placed him into a squad car, and recovered the ski mask and cell phone. On cross-examination, Officer Walker testified that the man who was with Brown was able to escape while the police pursued Brown. Officer Walker described this person as wearing a blue puffy leather jacket and having short hair.

Chicago police officer Joyce McGhee testified that she was Officer Walker's partner on

the night of the murder. Officer McGhee testified to substantially the same sequence of events as did Officer Walker, including having seen the two individuals running from the McDonald's parking lot. She added that when she first saw Brown and ordered him to stop running, Brown was holding a cell phone and appeared to be having a conversation. She also testified that the man who was with Brown was approximately 5 feet 9 inches tall, had a dark complexion, and was wearing a fluffy powder blue coat. As noted, this person was able to escape while the police pursued Brown. On cross-examination, Officer McGhee acknowledged that in a supplemental police report she did not indicate that one of the men she saw running from the alley was talking on a cell phone.

The parties stipulated to the testimony of Dr. Aldo Facer, who performed an autopsy on the victim. According to that stipulation, Dr. Facer observed nine gunshot wounds to the victim's body, specifically to his head, shoulder, neck, arm and leg. Dr. Facer also recovered spent bullets from the victim's body.

Chicago police officer Aguilera testified that he and his partner transported Brown to the police station in their squad car after other officers arrested Brown in the alley. At the police station, officer Aguilera recovered a black leather jacket and a pair of gloves from Brown.

Chicago police officer William Moore, a forensic investigator, was assigned to the homicide at approximately 9 p.m. on the night of the murder. He photographed and recovered live .40-caliber cartridges, spent .40-caliber cartridge cases, three fired bullets, and one metal fragment from a fired bullet. The cartridge cases and fired bullets were recovered near the victim's body or on the victim's neck. The officer then went to an alley approximately 1½ blocks

away from the crime scene and recovered a .40-caliber handgun that was lying in the snow directly across from where Brown had been arrested. Subsequently, at the police station, Officer Moore performed a gunshot residue test on Miller and recovered clothing from Brown. The clothing included a pair of black and white gloves, a black leather jacket, and a black, hooded sweatshirt.

Tonia Brubaker, a forensic scientist for the Illinois State Police specializing in testing and analysis of firearms evidence and identification, testified that she received and analyzed the .40-caliber semiautomatic handgun found near where Brown was arrested, several unfired .40-caliber cartridges, and two bullet jacket fragments. Brubaker testified that these two jackets did not have enough individual characteristics to determine whether they were fired from the .40-caliber handgun she received. With respect to one of those bullet fragments, however, Brubaker determined that it was consistent with a "right-hand twist" and that it was not fired by the same firearm as the other fired evidence. Brubaker also received three 38-.357-caliber fired bullets that were recovered from the scene of the murder and she testified that all three were fired from the same weapon and that they were not fired from the .40-caliber handgun. Brubaker was unable to determine the caliber or rifling characteristics of the bullet jacket fragment and it was inconclusive to the three fired bullets and the .40-caliber handgun. Brubaker also received two unfired .40-caliber bullets and several .40-caliber cartridge cases that were recovered from the scene of the shooting and testified that these fired cartridge cases were fired by the .40-caliber handgun. Brubaker received four fired bullets from the medical examiner's officer. One of those bullets was a 38-.357-caliber bullet and it was fired from the same handgun that fired the three .357-caliber

13

bullets she received that were recovered from the scene of the shooting. The remaining three bullets were .40-caliber bullets that were fired from the .40-caliber handgun recovered next to where Brown was arrested. Brubaker explained that a semiautomatic weapon such as the .40-caliber ejects spent cartridges after bullets are fired from it, whereas a revolver does not eject spent cartridges.

Sylvia Mahoney, a forensic DNA analyst, examined the black ski mask recovered in the alley and determined that Brown's DNA profile was included in the mixed DNA profile from the mask. She also examined the recovered black gloves and concluded that Brown could not be excluded as a contributor to the DNA profile she obtained from inside the gloves. She examined the black leather jacket and determined that it did not contain any human blood. Mahoney further testified that 99.961% of individuals from the African-American population could be excluded as contributors to the mixed DNA profile from the ski mask and that 99.981% of individuals from the African American population could be excluded as contributors to the DNA profile she obtained from inside the gloves.

Mary Wong, a forensic scientist for the Illinois State Police forensic science division, testified that she analyzed Brown's leather jacket, a pair of gloves, and a gunshot residue test kit that was performed on Miller's hands. Wong concluded that Miller may not have discharged a firearm or come in contact with primer gunshot-residue-related items and that if he did discharge a firearm, the particles were removed by activity or not detected by the procedure. Wong analyzed the right cuff of Brown's leather jacket and concluded that it was in the vacinity of a discharged firearm or that it came in contact with a primer gunshot-residue-related item. Wong

14

tested the back of the right glove, found unique and consistent particles, and concluded that the glove was in the vacinity of a discharged firearm or that it came in contact with a primer gunshot-residue-related item.

Robert Berk, a trace evidence analyst for the Illinois State Police, conducted additional analysis on the samples that Wong collected from Brown's clothing. Berk testified that with respect to the left cuff of the leather jacket, he identified four unique gunshot residue particles along with consistent particles and it was his opinion that the left cuff was positive for gunshot residue. When Berk originally tested the left glove, he identified five unique gunshot residue particles along with consistent particles and he originally concluded that the left glove was positive for gunshot residue. However, his lab subsequently adopted more stringent testing standards and therefore he could only identify two unique gunshot residue particles and could not say that the glove was positive for gunshot residue. The areas he tested on the samples were ones that Wong deferred on testing because she had already identified unique gunshot residue particles on the items of clothing.

The parties stipulated that if called as a witness, Detective Law of the Chicago police department would testify that on February 4, 2004, he recovered clothing from Brown, including a pair of gloves, a black leather coat, and a black, hooded sweatshirt. Detective Law would further testify that during the early morning hours of February 4, 2004, Miller and Charmain identified the ski mask that was recovered from Brown as the one worn by the shooter. Neither witness, however, was able to identify the pants. Detective Law would further testify that Sanders was unable to identify either the ski mask or the pants.

1-07-3374

ASA Robert Heilingoetter testified that he interviewed defendant at a police station on July 14, 2005. The ASA initially advised defendant of his *Miranda* rights and defendant indicated he would speak with the ASA. ASA Heilingoetter asked defendant if he knew John Brown and defendant responded that he did not and that he had never received any phone calls from that person. Defendant told that the ASA that he did know that victim and that the two had a "falling out" in June of 2003. Defendant said that he believed the victim had taken two cars that belonged to either himself or the funeral home, a Mercedes and a Range Rover, and that he reported those vehicles as stolen. According to defendant, the Range Rover was found a couple of blocks from defendant's home and an individual who was a friend of the victim was found driving the Mercedes.

Defendant told the ASA that he had not seen the victim since he left the funeral home but that he had been looking for him. Defendant indicated that the victim stole a credit card from him and used it to purchase jewelry. Defendant also said that he had a $500,000 life insurance policy on the victim and that he was aware of the victim having filed complaints against him with the police department's internal affairs division.

Although defendant initially said that he had not seen the victim since he left the funeral home in June of 2003, he subsequently told the ASA that he saw the victim at a car wash in September of 2003. The victim fled from defendant in his car and defendant chased him until the victim got into a car accident. After the victim left the funeral home, defendant also periodically ran the victim's name in the police department's computer system to ascertain the victim's location and whether he had any contact with law enforcement.

16

The ASA then asked defendant again if he knew John Brown, telling defendant that on the night of the murder Brown had been apprehended within a few blocks of where the victim was shot and that Brown had a cell phone in his possession at that time. The ASA also told defendant that the police had examined the records from that phone and found numerous calls to a phone they believed belonged to defendant. The ASA asked defendant if the phone number dialed from the phone found next to Brown was in fact defendant's cell phone number, and defendant acknowledged that it was. The ASA then discussed with defendant that there were also records of outgoing calls from defendant's phone to Brown's phone on the night of the murder. The ASA asked defendant to explain how he claimed to not know Brown given this information. Defendant paused and said, "Okay. Yes, I know John Brown." Defendant said he originally met Brown in May of 2003 and that it was the victim who made the introduction. According to defendant, the victim also told Brown that he and defendant were "such good friends that [defendant] has a $500,000 life insurance policy on his own life." Defendant stated that he did not see Brown again until Thanksgiving of 2003 when he was at his girlfriend's home.

Defendant further stated that after that meeting on Thanksgiving of 2003, Brown "somehow" must have gotten defendant's cell phone number because Brown repeatedly called him. During these conversations, Brown said that he would kill the victim for $100,000 out of the life insurance policy. Brown also told defendant that if defendant told the authorities, he would tell them that it was defendant's idea to hire Brown to kill the victim. The ASA reminded defendant that he was the police and asked him if he contacted the authorities to tell them that Brown was essentially attempting to blackmail him. Defendant said no and also said that he did

not contact Charmain or tell the victim that someone was soliciting money to kill him.

Defendant further stated that he received a phone call from Brown in January of 2004 and that Brown told him he had unsuccessfully attempted to shoot the victim. Defendant again told the ASA that he did not call anyone after Brown related this information. The ASA asked defendant if he received phone calls from Brown on the night of the murder and defendant said that he in fact received one phone call from Brown that night in which Brown told defendant, "it's gonna happen." Defendant told the ASA that was all he could remember of the call. The ASA confronted defendant with the fact that there were many calls between him and Brown on the day of the murder and asked defendant the nature of their conversations. Defendant "couldn't elaborate any further." Defendant also said that he was at his girlfriend's place on the day of the murder and that she lived approximately 50 blocks from where the shooting took place. The ASA told defendant that "cell cite" records indicated that defendant's cell phone was hitting a cell tower in the area where the victim was murdered and not 50 blocks away near his girlfriend's home. Defendant "couldn't answer how that could be."

The ASA then asked defendant if he knew Alfred Marley and defendant said that he did not and that he did not recognize a picture of Marley that the ASA showed him. Defendant said that Marley "must have been a friend of John Brown's." The ASA asked defendant if he owned or drove a maroon car at the time of the murder and defendant said that he did not. The ASA also asked defendant if he made a claim on the life insurance policy, and defendant responded that he had never made such a claim. The ASA asked defendant why he had not done so given that he had the policy. Defendant acknowledged having paid the premiums on the policy even after the

victim left the funeral home but would not respond as to why he had not made a claim on the policy. The ASA asked defendant why he kept the policy after the victim left the funeral home, and defendant said that it was a "good investment" and essentially that "it would be a good bet to keep the policy because of the lifestyle that [the victim] led." The ASA asked defendant if he would memorialize their conversation either through a written statement or a video statement, and defendant indicated that he did not wish to do so.

On cross-examination, ASA Heilingoetter testified that defendant was already under arrest at the time he was interviewed, that he had been arrested at 1 a.m., and that the interview took place approximately 10 hours later at 11:30 a.m. The ASA did not know if defendant slept during this time, but he was offered food and used the restroom. The ASA acknowledged that the funeral home where defendant worked was only a few blocks away from the scene of the murder.

Stacey Bentley testified that she knew and had a relationship with codefendant John Brown in February 2004. In the first week of February 2004, she looked for a teal green, two-tone van that she and Brown owned. Bentley spoke to someone and eventually found the van in the area of 79th Street and King Drive. Bentley testified that she and Brown each had keys to the van. Bentley knew Marley to be a friend of Brown's brother, and she also knew Randall Patterson as the cousin of Brown's nephew.

Michael Meyer testified that he worked as a State Farm insurance agent in Illinois and that he had sold defendant automobile, home, and life insurance in the past. In 2002, defendant bought a $500,000 life insurance policy on the victim from Meyer. Defendant referred to the victim as his partner in and a driver for a business known as E & A Leak Monument. The policy

19

was issued in January of 2003 and defendant paid the policy premiums from the date of issuance through February of 2004. The policy listed the victim as the insured, the primary beneficiary as defendant, and the successor beneficiaries as Christine and Sylvia Leak, who were listed as defendant's children.

On cross-examination, Meyer testified that defendant also held a life insurance policy on himself that listed his children as the beneficiaries. Meyer also testified that a life insurance policy requires an insurable interest and that this requirement was satisfied with respect to the policy defendant held on the victim because defendant considered the victim a business partner and because there were cars being leased and there were debts accruing or being paid on those leases. Finally, Meyer testified that the insurance policy defendant purchased on the victim contained an incontestibility clause, which meant that if the insured dies after the policy has been in effect for over two years the insurance company cannot contest it and must pay out to the beneficiary. Under the terms of the policy, the insurance company has the right to contest a payout of the policy if the insured dies within two years of its issuance.

The parties stipulated that on December 20, 2003, one of Meyer's employees spoke with defendant and the victim on the phone for purposes of gathering information relevant to the life insurance policy defendant obtained on the victim. The parties further stipulated that if called as a witness, another State Farm insurance agent would testify that on March 1, 2004, she received a written claim for benefits from defendant on the policy he obtained on the victim. That agent would further testify that defendant contacted her approximately 11 times between March 3, 2004, and August 5, 2004, regarding the status of his claim.

20

Lucretia Johnson testified that in 2003 she performed blood and urine tests for a company that conducted life insurance exams. On January 3, 2003, she met with the victim at the funeral home because he had applied for a life insurance policy, and she drew his blood and took a urine sample from him.

Lamica Long testified that in June of 2003, she purchased a cell phone pursuant to Brown's request. Long signed the contract on the phone and gave it to Brown, who thereafter picked the phone bills up from her. Long observed Brown using the phone on multiple occasions.

The parties stipulated to the authenticity of phone records from defendant's cell phone from January 21, 2004, through February 20, 2004, and that the "cell cite" information from those records provides the cell tower that a calls hits off at the time the call is made. The parties also stipulated to the authenticity of the records from the cell phone in Long's name that she gave to Brown from the January 4, 2004, through February 3, 2004.

Rachel Sterk testified that she works as a research analyst for the Chicago High Intensity Drug Trafficking Area (Chicago HIDTA). She analyzed the phone records previously stipulated to by the parties, including calls made from defendant's cell phone to the phone purchased by Long during the time period of 4:15 p.m. to 8:32 p.m. on the date of the murder. During this time period, defendant's cell phone "hit" off of cell towers that were in the vicinity of where the victim was murdered.

Patricia Bombard also works for the Chicago HIDTA and she testified that between January 4 and February 3 of 2004, there were 117 calls from Brown's cell phone to defendant's cell phone and 128 calls from defendant's cell phone to Brown's cell phone.

Louis Velez testified that he worked for the Chicago police department prior to 2005 in the internal affairs division (IAD). In September of 2003, the IAD received an anonymous complaint against defendant and also received a complaint made by the victim against defendant. Velez did not inform defendant of these complaints. Velez further testified that his investigation was still ongoing in February of 2004 and that on February 3, 2004, defendant worked the midnight to 8:30 a.m. shift.

The State then rested its case and defendant presented the testimony of Gervaise Phillips. Phillips testified that in September of 2003, defendant, Spencer Leak, and the police came to the car wash where he worked looking for the victim.

Marty Fair testified that in the summer of 2003, he lived in a condominium building where the victim also lived. Defendant came to that building in the summer of 2003 and advised Fair that the there were warrants out on the victim and that the police were looking for him.

The parties also stipulated that in September of 2003, a Chicago police department law bulletin noted that the victim was wanted by the police.

At the conclusion of this evidence, the jury found defendant guilty of first degree murder and also found that defendant procured another to commit that murder for money or something of value. The trial court sentenced defendant to a term of 75 years' imprisonment. This appeal followed.

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. Defendant maintains that there were numerous inconsistencies in the testimony of the occurrence witnesses and that Alfred Marley was not a credible witness.

22

When reviewing challenges to the sufficiency of the evidence in a criminal case, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime upon which the defendant was convicted beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). A criminal conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

In order to sustain defendant's conviction, the State was required to prove that defendant performed the acts which caused the victim's death and that when he did so, he either intended to kill the victim, knew that his acts would cause the victim's death, or knew that such acts created a strong probability of death or great bodily harm to the victim. See 720 ILCS 5/9-1(a) (West 2004). As noted, the jury in this case found the additional fact that defendant procured another to commit the murder for money or anything of value. See 720 ILCS 5/9-1(b)(5) (West 2004).

In this case, the evidence adduced at trial established that defendant was the only person involved who had a motive to kill the victim. Defendant and the victim had a "falling out" over funds that defendant believed the victim had embezzled from the funeral home where defendant worked as a director and where the victim had worked as a dispatcher. Defendant was also aware that the victim had filed complaints against him with the police department. Defendant purchased a life insurance policy on the victim that listed himself as the beneficiary and his children as successor beneficiaries, and defendant paid the premiums on that policy until the victim's death. Defendant was observed looking for the victim prior to the murder and making threats that he was

23

going to kill him, and around Thanksgiving of 2003, Charmain saw defendant circling the house in which she lived with the victim.

The State also presented evidence upon which the jury could conclude that defendant hired Brown to commit the murder and that Brown, in turn, solicited Marley's help. Defendant met Brown in Thanksgiving of 2003 and from January 4 through February 3 of 2004, defendant called Brown 128 times while Brown called defendant 117 times. According to Marley's testimony, Brown was hired by a Chicago police officer to perform a "hit" on the victim and Brown offered to pay Marley $1,500 in return for Marley's assistance. Brown told Marley that the payment for the hit was coming from the Chicago police officer and that the source of this money was an "insurance policy."

There was also sufficient evidence presented at trial to establish that Marley and Brown did in fact kill the victim at defendant's request. According to Marley's testimony, he and Brown made an unsuccessful attempt to kill the victim and, on February 3, 2004, Brown picked Marley up in a blue van and they went to the daycare center with the intention of killing the victim. Brown had an automatic weapon and he gave Marley a revolver. Marley punctured the tire on Charmain's jeep and then waited in a van with his friend Randy for the victim to leave the daycare center while Brown waited in a maroon car with the police officer who hired him to perform the hit. Randy received a call from Brown when the victim left the daycare center and thereafter Marley exited the vehicle and walked around the daycare center to get to the victim's car. While doing so, he heard gunshots and then came upon the victim lying shot in the street. Marley saw Brown moving in a nearby gangway and then Marley shot the victim two or three times. Marley then met Brown, who

he said was wearing a black or blue coat and a black ski mask, in the gangway and they walked toward a McDonald's parking lot where Brown said they were supposed to meet the police officer. The officer was not in the parking lot, however, and the police arrived and chased Brown down an alley while Marley was able to escape.

Marley's version of events was corroborated by other testimony presented at trial. Charmain testified that she saw a suspicious van when she left the daycare center, that there was a metal object protruding from her tire, and that she saw the suspicious van again when she and victim came outside after calling a tow truck. Charmain also testified that a man in a black jacket and black ski mask shot the victim, and her account of the shooting was substantially corroborated by the testimony of Miller and Sanders. Miller added that after he and Charmain fled the scene, he saw the person who looked like the shooter standing with another man in the alley next to the McDonald's parking lot. When the police arrived at the scene, they saw two men running from the area in which the victim had been shot. One of those men was able to get away, while the other, Brown, was arrested in a nearby alley wearing a black leather jacket and black gloves. The police recovered a black ski mask, a cell phone, and a .40-caliber handgun next to where Brown was arrested.

The forensics experts testified that the black ski mask and gloves contained Brown's DNA. The right cuff of Brown's black leather jacket and one of the black gloves had been in the vicinity of a discharged firearm or had come in contact with a primer gunshot-residue-related item, and the left cuff of the leather jacket was also positive for gunshot residue. The ballistics evidence established that the victim was shot nine times by two different weapons. Spent .40-caliber bullets

were found inside the victim's body and at the scene of scene of the shooting. These were fired from the gun that was recovered near where Brown was arrested. Fired .357-caliber bullets were found in the victim and at the scene of the crime, and all were fired from the same weapon.

In addition to the above evidence, cell phone records established that defendant spoke to Brown on the day of the murder and that defendant's cell phone was in the vicinity of where the victim was killed at the time of the shooting. The jury also heard ASA Helingoetter's testimony regarding his interview with defendant. According to the ASA, defendant initially denied knowing Brown and then admitted to knowing him when confronted with the phone records. Defendant told the ASA that Brown offered to kill the victim, and defendant did not attempt to dissuade Brown or warn the victim. Defendant acknowledged receiving a call from Brown on the night of the murder during which Brown said, "it's gonna happen." Defendant again did not attempt to discourage Brown or warn the victim. The jury heard ASA Heilingoetter's testimony that, when confronted with the phone records establishing his presence at the scene of the shooting on the night of the murder, defendant was unable to explain "how that could be." Finally, the record establishes that defendant made a claim on the life insurance policy on March 1, 2004, and that he contacted an insurance agent 11 times between March 3 and August 5, 2004, regarding the status of that claim.

We find that this evidence was sufficient to prove defendant guilty of first degree murder beyond a reasonable doubt. This evidence also was sufficient for the jury to find that defendant procured another to commit the murder for money.

Defendant nevertheless argues that a rational jury could not have found him guilty beyond a

reasonable doubt because of inconsistencies in the witnesses' testimony. Among other things, defendant claims that Charmain and Miller testified that a metallic antenna was lodged in Chairman's tire while Sanders testified that the object he found near the tire was a plastic straw, that Chairman claimed that the van circling the daycare center was missing only one headlight while Miller asserted that both headlights were missing, and that Miller testified that the gun he saw was black while Sanders asserted that it was chrome. Defendant further maintains that the evidence was insufficient to support his conviction because, among other things, he had a valid business reason to hold a life insurance policy on the victim, that the victim was the source of the funds missing from the funeral home and therefore defendant sought to find the victim for legal purposes, and that the evidence establishing that defendant made cell phone calls near the scene of the murder can be explained by the fact that the funeral home where he worked was located near where the victim was shot. Finally, defendant claims that Marley was not a credible witness because he testified at defendant's trial in exchange for a recommended sentence, he had prior convictions, and because there were inconsistencies in his testimony.

We find that defendant's claims amount to no more than an attack on the credibility of the witnesses and the weight to be given to their testimony. However, in considering a challenge to the sufficiency of the evidence, it is not the function of this court to reweigh the evidence or retry the defendant. *People v. Johnson*, 347 Ill. App. 3d 442, 445 (2004). Rather, the trier of fact, in this case the jury, is responsible for resolving inconsistencies in the evidence and determining the credibility of the witnesses and the weight to be given to their testimony. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). For example, it was for the jury to decide whether defendant's cell

27

phone was in the vicinity of where the victim was killed because he was working at his nearby funeral home, as defendant suggests, or because he was involved in a conspiracy with Brown and Marley to murder the victim. Similarly, the jury was aware of the reasons that defendant claims Marley was not a credible witness and it was the jury's responsibility to accept or reject as little or as much of Marley's testimony as it saw fit. The other alleged inconsistencies pointed to by defendant were minor in nature, were fully explored at trial, and do not, by themselves, create a reasonable doubt as to defendant's guilt. See *People v. Cunningham*, 309 Ill. App. 3d 824, 827 (1999); *People v. Brown*, 388 Ill. App. 3d 104, 109 (2009). Viewed in the light most favorable to the State, the evidence presented at trial was not so improbable or unsatisfactory that it created a reasonable doubt as to defendant's guilt.

Defendant next contends that the trial court erred by failing to declare a mistrial after ASA Heilingoetter testified that defendant invoked his right to counsel during a postarrest interview. The decision to declare a mistrial lies within the discretion of the court, and a mistrial should be declared only if there is some occurrence at trial of such a character and magnitude that the party seeking a mistrial is deprived of a fair trial. *People v. Foster*, 394 Ill. App. 3d 163, 166 (2009).

The record shows that the alleged error occurred while ASA Heilingoetter was testifying on direct examination regarding his interview with defendant at the police station following defendant's arrest. The ASA testified to the statements defendant made during that interview, including whether he knew Brown, the insurance policy defendant held on the victim, and phone calls between defendant and Brown leading up to and after the victim's murder. The following exchange then took place while the ASA was still testifying for the State on direct examination:

28

"Q. After that did you try to ask him about memorializing this conversation you just described to the jury?

A. Yes. We had been speaking for several hours, and at the conclusion of our conversation I had asked him whether we could memorialize our conversation - -.

MR. QUITE [Defense counsel]: Judge, I would object to this and I would like to be heard outside the presence of the jury.

THE COURT: Overruled.

THE WITNESS: A. We asked him if he wished to memorialize the statement we had with him at that time. I told him I could write up a handwritten summary, basically summarizing everything that he told me, he would get an opportunity to review that summary, make any corrections or changes that he wished to that summary and we could all sign off on it. I told him the other thing we could do is I could call a videographer, much like the videographer that is in court today, and that I would ask him the same series of questions and he could give the same series of answers to our discussion, and then the videographer would take down word for word all the questions I asked him and all the answers that he gave, she would type up a copy of that, he would get an opportunity to read through that, review that, make any

29

changes or corrections that he wished to that. I asked him whether

or not he wished for me to call the videographer, and he stated at

that time that he did not wish for that but at that time he stated that

he would like a lawyer."

    MR. QUITE: Judge, I am going to object and move for

mistrial. That's inadmissible."

The trial court then struck the ASA's statement that defendant asked for an attorney and instructed the jury to disregard that statement.

Defendant claims that the ASA's reference to defendant asking for an attorney was improper and penalized him for exercising his fifth amendment right to counsel. Defendant asserts that such a request for counsel may not be used as evidence against him at trial and that, in this case, the ASA's statement created an inference in the jurors' minds that defendant was or believed himself to be guilty. We disagree.

It is error to comment on a defendant's post-arrest silence or exercise of his right to counsel. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); *People v. Kennedy*, 33 Ill. App. 3d 857, 861-62 (1975) (holding that it was plain error to elicit testimony that defendant exercised his right to counsel and to comment upon it during closing argument). However, "[i]t is not error to elicit a complete recitation of police procedure, even if the recitation includes reference to a defendant's exercise of his constitutional rights, so long as the recitation is not argued to be indicative of guilt." *People v. Lindgren*, 111 Ill. App. 3d 112, 117 (1982); *People v. Lasumba*, 92 Ill. App. 3d 621, 625 (1980); *People v. Martinez*, 86 Ill. App. 3d 486, 489

30

(1980).

In this case, it is apparent that the prosecutor did not elicit the disputed testimony to raise the inference of defendant's guilt. In fact, the testimony was not elicited at all. Rather, the prosecutor asked the ASA an open-ended question as to whether there was an attempt to memorialize defendant's statements and the reference to defendant having asked for an attorney was made at the end of a lengthy narrative response by the ASA. The trial court struck the comment immediately and ordered the jury to disregard it. The prosecutor did not ask any direct questions pertaining to defendant's request for counsel and made no further reference to it during the remainder of trial or closing arguments. This case is therefore unlike *Doyle* or *Kennedy*, in which the disputed testimony was argued by the prosecution as an indicia of guilt. See *Doyle*, 426 U.S. at 613-15, 49 L. Ed. 2d at 95-96, 96 S. Ct. at 2242-43 (postarrest silence); *Kennedy*, 33 Ill. App. 3d at 859-62 (right to counsel). Under the circumstances of this case, we find that defendant's rights were not violated by the disputed testimony and we therefore cannot say that the trial court's refusal to declare a mistrial based upon that testimony was an abuse of discretion. See, *e.g.*, *People v. Frieberg*, 147 Ill. 2d 326, 354-55 (1992) (finding no error in testimony that defendant asked for an attorney where the testimony was inadvertently elicited, the jury was instructed to disregard it, and the prosecution did not comment upon defendant's request for counsel during closing arguments); *Lindgren*, 111 Ill. App. 3d at 117-18 (finding no error in witnesses' testimony that defendant invoked his right to counsel and to remain silent where the testimony was not elicited to establish defendant's guilt and where the prosecutor did not capitalize upon the testimony during closing arguments); *People v. Smith*, 160 Ill. App. 3d 89, 96 (1987);

*LaSumba*, 92 Ill. App. 3d at 624-26; *Martinez*, 86 Ill. App. 3d at 489.

Moreover, any possible error was harmless beyond a reasonable doubt.  See *Frieberg*, 147 Ill. 2d at 355 (finding any error in testimony that defendant requested counsel harmless beyond a reasonable doubt).  In addition to the facts discussed above, any error was cured by the trial court's instruction to the jury to ignore the ASA's remark.  See *People v. Lopez*, 371 Ill. App. 3d 920, 934 (2007) (noting that there is a strong presumption that jurors follow the instructions given by the court).  As the trial court noted when denying defendant's motion for a new trial, there is nothing to suggest that the jury ignored the court's instruction.  We also note, as did the trial court, that the jury asked for and received the transcript of the ASA's testimony and the comment on defendant's request for counsel had been stricken before the jury received the transcript.

Defendant further contends that the trial court erred by prohibiting him from cross-examining Charmain regarding her knowledge and interest in an alleged lawsuit filed by the victim's family seeking the proceeds of the life insurance policy that defendant held on the victim.

The record shows that during her cross-examination, defense counsel asked Charmain if after the victim's death she became aware that there was a life insurance policy covering the victim.  Charmain responded in the affirmative.  Counsel then asked Charmain if she also learned that defendant was the beneficiary of that policy, and Charmain responded that she learned this information after the victim died.  Counsel then attempted to ask Charmain if she believed that Jaylin, the son she had with the victim, might have some right to the proceeds of that policy.  The trial court sustained the prosecutor's objection to this question on the grounds of relevance.

Subsequently, defense counsel again raised the issue and told the court that the bias of any

32

witness was not collateral and was a proper subject for cross-examination. Counsel then argued:

> "We tried to establish that since this incident, Miss Ankum's minor son, who was the offspring of Fred Hamilton, has a matter pending to challenge Mr. Leak's right to the insurance proceeds. And if he's convicted, her son will become very wealthy. He will get maybe half a million dollars. And I think that goes to her bias in testifying. We wanted to establish that. That would be our offer of proof."

The trial court responded to counsel's argument and explained its reasoning for limiting cross-examination on this matter:

> "For the record, that not only is collateral, but there is no evidence that she has changed her testimony from the time that she spoke to the police and the time that she found out about the existence of the life insurance policy that she testified to she was unaware of and her son nor her were the beneficiaries of. So, your objection is noted."

Defendant claims that through this line of questioning he intended to establish that Charmain knew that if defendant were found guilty of the victim's murder he would become ineligible under the law to obtain proceeds of the insurance policy. Under these circumstances, defendant asserts, the proceeds of the policy would eventually flow to the victim's estate, of which Charmain's son was a member. Defendant concludes that this evidence gave rise to the inference that Charmain had a financial motive to testify against defendant and that therefore the trial court's ruling improperly foreclosed a legitimate inquiry into Charmain's alleged bias and denied him his

fifth amendment right to confront the witnesses against him. We disagree.

We begin by noting that the scope of cross-examination is within the sound discretion of the trial judge and that a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Green*, 339 Ill. App. 3d 443, 455 (2003). While a defendant in a criminal prosecution has the right to cross-examine a witness regarding her bias, interest, or motive to testify falsely, the evidence used to impeach the witness must give rise to the inference that the witness has something to gain by her testimony. *People v. Sims*, 192 Ill. 2d 592, 624-25 (2000); *People v. Triplett*, 108 Ill. 2d 463, 475 (1985). Thus, the evidence used to establish bias must be timely, unequivocal and directly related, and may not be remote or uncertain. *Sims*, 192 Ill. 2d at 625. The trial judge has no discretionary power to deny the defendant his right to show bias but does have broad discretion to preclude repetitive or unduly harassing questioning. *Triplett*, 108 Ill. 2d at 475.

In this case, we conclude that the trial court did not abuse its discretion by limiting defendant's cross-examination of Charmain regarding her knowledge of the alleged lawsuit. The purpose of an offer of proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced. *People v. Peeples*, 155 Ill. 2d 422, 457 (1993). "Where it is not clear what a witness would say, or what [her] basis would be for saying it, the offer of proof must be considerably detailed and specific." *Peeples*, 155 Ill. 2d 457-58. Although defendant made an offer of proof to the trial court in this case, that offer of proof was lacking. For example, defendant offered no evidence to substantiate his claim that the victim's son had filed a lawsuit challenging defendant's right to the proceeds of the insurance policy.

Defendant did not provide a case name or number associated with this alleged lawsuit. Defendant also did not explain how the victim's son might have a right to the proceeds of the insurance policy given that the policy did not name him as a beneficiary. We are aware of no authority, and none has been provided by defendant, which would allow the victim's son to step into the shoes of the named beneficiaries and collect on that policy. Even if defendant had offered the above explanations, Charmain's son, not Charmain, would be the person who stood to benefit financially from defendant's conviction. Moreover, defendant offers nothing to rebut the trial court's conclusion that there was no evidence establishing that Charmain had changed her testimony in any way from the time she spoke to the police after the murder until when she discovered that defendant held a life insurance policy on the victim. Under these circumstances, we find that any alleged incentive on Charmain's part to testify falsely against defendant based upon this alleged lawsuit was simply too remote and uncertain. See, *e.g.*, *Sims*, 192 Ill. 2d at 627-28 (finding no error in the circuit court's granting of a motion *in limine* precluding the defense from cross-examining a DNA expert about the fact that he entered into a predisciplinary agreement with his employer regarding a theft where the evidence that the expert had a motive to fabricate DNA evidence was too remote and uncertain); *People v. Foster*, 322 Ill. App. 3d 780, 785 (2000). Accordingly, we cannot say that the trial court's limitation on defendant's proposed line of questioning constituted an abuse of discretion.

In a related argument, defendant claims that the trial court's limitation on his cross-examination of Charmain denied him his right to confront the witnesses against him. A defendant's right to confront witnesses against him, including cross-examination for the purpose of showing

any interest, bias, prejudice or motive to testify falsely, is guaranteed by both the federal and state constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §8. The constitutional guarantee and the common law right are separate, and the discretionary authority of the trial court to restrict the scope of cross-examination comes into play after the court has permitted, as a matter of right, sufficient cross-examination to satisfy the confrontation clause. *People v. Averhart*, 311 Ill. App. 3d 492, 497 (1999). A defendant's rights under the confrontation clause, however, are not absolute. The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense desires. *Delaware v. Fensterer*, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985). The test is whether limitation on cross-examination created a substantial danger of prejudice by denying defendant his right to test the truth of the testimony. *People v. Harris*, 123 Ill. 2d 113, 145 (1988). As has been explained:

> "To determine the constitutional sufficiency of cross-examination, a court looks not to what the defendant had been prohibited from doing, but to what he had been allowed to do. If the entire record shows that the jury had been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant had been prohibited on cross-examination from pursuing other areas of inquiry." *People v. Wilson*, 254 Ill. App. 3d 1020, 1045 (1993).

Our review of the record in this case establishes that defendant was given more than

sufficient opportunity to confront, cross-examine, and test Charmain's credibility as a witness. The jury was informed that Charmain dated the victim, that the two had a child together, and that Charmain knew that defendant was the person who allegedly hired two men to murder her boyfriend. The jury was also told that prior to her testimony at defendant's trial, Charmain became aware that defendant obtained an insurance policy on the victim that listed defendant as the beneficiary and defendant's children as successor beneficiaries. These facts sufficiently placed before the jury the issue of Charmain's potential bias and credibility as a witness. The trial court placed no other meaningful restriction on defendant's cross-examination of Charmain and therefore, under these circumstances, we cannot say that the trial court's ruling violated defendant's right to confront the witnesses against him. See, *e.g.*, *Wilson*, 254 Ill. App. 3d at 1045 (trial court did not abuse its discretion in barring cross-examination of a witness concerning a robbery where other evidence and argument to the jury sufficiently brought that witness's credibility to the jury's attention); *People v. Green*, 339 Ill. App. 3d 443, 456 (2003).

Defendant next contends that the trial court erred by allowing Marley to testify to Brown's hearsay statements under the coconspirator exception to the hearsay rule. The admission of evidence lies within the sound discretion of the trial court, and a reviewing court will review the trial court's ruling only for an abuse of discretion. *People v. Phillips*, 392 Ill. App. 3d 243, 272 (2009). An abuse of discretion occurs only where the court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Phillips*, 392 Ill. App. 3d at 272.

Pursuant to the coconspirator exception to the hearsay rule, any declaration by one

coconspirator is admissible against all coconspirators where the declaration was made during the course of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 140 (1998). Statements made in furtherance of a conspiracy include those that have the effect of advising, encouraging, aiding or abetting its perpetration. *Kliner*, 185 Ill. 2d at 141. In order to establish a *prima facie* showing of a conspiracy, the State must prove by a preponderance of the evidence (independent of the coconspirator's hearsay statements) that: (1) two or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) an act or acts were done by one or more of them in furtherance of the conspiracy. *People v. Batrez*, 334 Ill. App. 3d 772, 783 (2002).

Defendant initially claims that the State failed to set forth sufficient evidence independent of Brown's hearsay statements establishing that defendant engaged in a conspiracy with Marley and Brown. We disagree. As discussed above, the evidence presented at trial established that Brown and Marley made one unsuccessful attempt to kill the victim and that they went to the daycare center on the day of the murder with the intention of killing the victim. While waiting for the victim to leave the daycare center, Marley observed a maroon car arrive at the scene and he also observed Brown enter that car and speak with its driver. The evidence also established that Marley and Brown killed the victim, and the flight paths of both men following the murder suggest that they had a common plan as to how they intended to escape following the shooting. Defendant claims that the State failed to establish a "participatory link" between himself and a conspiracy between Brown and Marley to murder the victim. However, the evidence at trial established that defendant alone had a personal motive to kill the victim. Defendant met Brown in 2003 and there

38

were hundreds of phone calls between the two leading up to the day of the murder. Telephone calls were made between the defendant and Brown on the day the victim was killed and, according to ASA Heilingoetter's testimony, defendant acknowledged receiving a call from Brown on that day in which Brown said "it's gonna happen." On the day of the murder, Marley saw Brown enter a maroon car as he waited for the victim to exit the daycare center, and cell phone records established that defendant was present in the area at this time. We find that this evidence established by a preponderance of the evidence that defendant, Brown and Marley engaged in a conspiracy to murder the victim.

Defendant nevertheless argues that the State failed to meet its burden of establishing a conspiracy. In making this argument, defendant isolates each piece of evidence and claims that, by itself, it does not establish a conspiracy. For example, with respect to the phone calls placing defendant near the scene, defendant notes that the funeral home where he worked is also near where the victim was killed. Defendant likewise claims that the numerous phone calls between himself and Brown establish only an association between the two that is an insufficient basis upon which to infer a conspiracy. Regarding Marley's testimony that he saw Brown enter a car with another man before the murder, defendant claims that, at most, this evidence establishes defendant's presence at the crime scene but is insufficient to show that defendant "intended to join or associate himself with the objectives of the conspiracy." Finally, defendant argues that the insurance policy he held on the victim and his knowledge that the victim filed complaints against defendant fail to show that defendant participated in the conspiracy.

The flaw in defendant's argument is that it views each piece of evidence in isolation and

assumes that direct evidence of a conspiracy is required. However, the existence of a conspiracy need not be proven by direct evidence and instead may be inferred from all of the surrounding facts and circumstances. *People v. Cook*, 352 Ill. App. 3d 108, 125 (2004). " 'Because of the clandestine nature of conspiracy, Illinois courts permit broad inferences to be drawn from the circumstances, acts, and conduct of the parties,' and the suspicious nature of the activities of alleged coconspirators can be sufficient to prove a joint venture." *Cook*, 352 Ill. App. 3d at 125, quoting *Batrez*, 334 Ill. App. 3d 783-84. In this case, the evidence presented at trial, when viewed in its entirety, was more than sufficient to support the inference that defendant, Brown and Marley were involved in a conspiracy to murder the victim.

Defendant also claims that Brown's hearsay statements were not made in furtherance of a conspiracy and therefore do not fall within the coconspirator exception to the hearsay rule. Defendant first takes issue with Marley's testimony that Brown told him that a Chicago police officer hired Brown to commit the murder in exchange for proceeds of a life insurance policy. Defendant also takes issue with Marley's testimony that Brown offered to pay him $1,500 for his assistance in committing the murder, and that this money was to come from the Chicago police officer. Defendant claims that these statements were not intended to recruit Marley to the conspiracy and that the source of the payment and the fact that the hit was for a police officer were superfluous and did not help Marley perform his role in the conspiracy. We disagree. The above statements were not simply narratives of a past crime. Rather, they explained how Brown recruited Marley and solicited his help in performing a "hit" on the victim. The fact that money was involved, the specific source of that money, and the involvement of a police officer were

40

certainly important and relevant to defendant's ability to recruit Brown and, in turn, to Brown's ability to recruit Marley. We find that these statements were made in furtherance of the conspiracy and therefore their admission was not an abuse of discretion.

Defendant also argues that the court should not have allowed Marley to testify that Brown said the police officer was going to pick Marley and Brown up in the McDonald's parking lot. However, statements relating to attempts at concealment further the conspiracy, including those regarding escaping punishment. *Kliner*, 185 Ill. 2d at 141. The statement defendant objects to clearly furthered the conspiracy because it involved Brown advising Marley as to how they were going to escape after the murder. Thus, the statement was properly admitted.

Finally, defendant argues that the court erred by allowing Marley to testify that Brown told him that the police officer was sitting in the maroon car that Brown entered on the night of the murder. However, even if we were to agree with defendant that this statement was more a narrative of the crime as opposed to a statement in furtherance of the conspiracy and was therefore improperly admitted, we would find its admission harmless beyond a reasonable doubt. The evidence presented at trial, including the cell phone records establishing defendant's presence in the area of the shooting at the time of the murder, was more than sufficient to prove defendant guilty beyond a reasonable doubt. Therefore, we conclude that defendant would have been found guilty even if the statement had not been admitted. See *People v. Brown*, 341 Ill. App. 3d 774, 783 (2003) (finding any error in the admission of a conversation pursuant to the conspirator exception to the hearsay rule harmless where the defendant would have been convicted even if the conversation had not been admitted at trial).

Defendant's final contention is that the trial court erred by conducting a simultaneous but separate jury trial with codefendant Brown. The record shows that defendant and codefendant Brown were tried simultaneously but before two separate juries. Both juries were present for the direct examination of each witness, while opening and closing arguments as well as cross-examination of the State's witnesses were conducted separately. Finally, the record shows that prior to trial the court advised all of the jurors of the manner in which the trial would be conducted and explained that each jury was only to decide the guilt or innocence of its corresponding defendant.

Despite these procedures, defendant claims that the court's failure to sever his trial requires reversal because he and Brown presented antagonistic defenses, because the evidence presented against Brown was overwhelming when compared to the evidence presented against defendant and therefore led to juror confusion, and because the joint trial denied defendant his right to confront the witnesses against him based upon the admission of Brown's hearsay statements.

We find that defendant has waived this contention because he did not raise it prior to or during trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to raise objection at trial and include the objection in a posttrial motion results in waiver of that issue on appeal). A defendant who believes that he will suffer prejudice as a result of joinder of his case with that of a codefendant may request a severance in a pretrial motion. *People v. Daugherty*, 102 Ill. 2d 533, 541 (1984); 725 ILCS 5/114-8 (West 2004). In this case, defendant did not move for such a severance prior to trial. Defendant claims, however, that he did advise the court of the prejudice that would result if a joint but simultaneous trial was held. However, the citations to the record

defendant provides in support of this claim do not establish that the issue was properly raised. Defendant's first citation is to his posttrial motion in which he raised the claim that the trial court erred by conducting simultaneous but separate jury trials. This does not establish that the issue was raised prior to trial. Defendant's other citation is to a page of the record in which the court is denying defendant's posttrial motion and specifically explaining why the simultaneous but separate jury trials were proper. The only statement by the court that could form the basis of defendant's claim that the issue was raised prior to trial is the court's statement that it "wanted to put on the record that prior to trial, counsel had approached with regard to the room that we held the trial in. And because there were two separate defendants with two separate defense teams, we had an actual separate table for each defense team." The most reasonable interpretation of this statement is that defense counsel asked the court a logistical question about the layout of the courtroom given that defendant and Brown were to be tried simultaneously. We certainly cannot extrapolate this vague reference as establishing that defendant moved for a severance or claimed that he would be prejudiced by simultaneous jury trials.

Our review of the record further establishes that the trial court addressed the only objection defendant made to the simultaneous jury trials. Specifically, prior to *voir dire*, defense counsel stated, "we are concerned about the co-defendant cross-examining a witness in front of our jury. We would object to co-defendant cross-examining a witness. They can cross-examine that witness in front of their jury, but because there's an antagonism here that we would object to, I think the public defender is objecting to our cross-examining." The trial court responded, "you can do separate cross-examinations," and the issue was never again raised until defendant's posttrial

motion.

Finally, defendant did not object to any of the direct testimony of the State's witnesses that was heard simultaneously by each jury. Had defendant believed that certain evidence was relevant only against Brown and not against himself, he could have made that objection known to the court during trial and during any of the witnesses' testimony.

Ultimately, defendant did not seek a severance or raise an objection to the simultaneous but separate jury trials until he raised the issue in his posttrial motion. In this respect, we note that two of the three grounds upon which defendant objects to the simultaneous but separate jury trials on appeal were not specifically raised in his posttrial motion and are waived for this reason as well. See *People v. Moore*, 171 Ill. 2d 74 (1996) (an objection upon a specific ground is a waiver of all grounds not specified). In his posttrial motion, defendant claimed that the simultaneous jury trials indicated to defendant's jury that the court had concluded prior to trial that both he and Brown were involved in the same crime, that defendant and Brown presented antagonistic defenses, that Brown's presence in the same courtroom as defendant undermined defendant's argument that he was extorted by Brown because it suggested "a cozy rather than an extortionate relationship existed between the two," and that there is risk of prejudicial error inherent in the procedure of conducting simultaneous trials. Defendant did not claim, as he now does on appeal, that he was prejudiced by the overwhelming evidence against Brown or that the manner in which the trial was conducted denied him his right to confront Brown regarding the hearsay statements to which Marley testified at trial. For this reason as well, we find that defendant's contentions regarding Brown's hearsay statements and the overwhelming evidence against Brown are waived.

44

Moreover, even if defendant's contention were not waived, we would find it to be without merit. A defendant does not have a right to be tried separately from his companions when charged with an offense arising out of a common occurrence. *People v. Ruiz*, 94 Ill. 2d 245, 257 (1982). In Illinois, it is constitutionally permissible for a trial judge to conduct simultaneous jury trials before two juries in the same courtroom. *People v. Mack*, 238 Ill. App. 3d 97, 105 (1992). Such a procedure is permissible so long as the defendant is given every opportunity to present a complete defense to his own jury, there is no event which confused the jury or affected its ability to render a fair decision, and the record shows that the jurors were adequately prepared for the procedure. *People v. Negron*, 220 Ill. App. 3d 754, 766-67 (1991). It is within the trial court's discretion to determine whether a severance should be granted in a particular case. *Ruiz*, 94 Ill. 2d at 257. "The primary question to be considered is whether the defenses of the several defendants are so antagonistic that any or all of them could not receive a fair trial unless severance is granted." *Ruiz*, 94 Ill. 2d at 257.

In denying defendant's posttrial motion in this case, the trial court ruled that defendant was not denied a fair trial by the fact that he and Brown were tried simultaneously before separate juries. The court noted that there was a separate table for each defense team, that at no time were the defendants seated side by side, that they were in fact separated by a minimum of four people, and that the court did not notice any familiarity or antagonism between the two defendants. The court further noted that the defendants' statements were not admissible against each other and that for that reason the trials were held separately. The court also stated that the case involved a murder for hire and therefore the charges against each defendant arose out of the same incident,

that the witnesses in each trial were the same, and that at no point "did one jury hear the other jury's cross-examination." For these reasons, the court concluded that defendant's rights were protected during trial.

We agree with the trial court's assessment. In addition to the facts noted by the trial court, we also note that the court adequately prepared each jury for the simultaneous but separate trials. The court explained to each jury the manner in which the trial was to be conducted and that each jury was to decide only the guilt or innocense of its respective defendant. Each jury was selected from a separate venire and cross-examination of the State's witnesses as well as opening and closing statements were conducted separately. Each jury was aware of the other jury and the court took care to ensure that each jury heard only the evidence which was relevant to its respective case. Additionally, although defendant claims that the overwhelming evidence against Brown led to juror confusion and denied him a fair trial, defendant fails to explain precisely how this was the case and nothing in the record indicates that defendant's jury was confused or unable to render a decision fairly. Moreover, this case involved a murder for hire and therefore a majority of the evidence presented was relevant to each case. Under these circumstances, we cannot say that the procedures adopted by the trial court amounted to an abuse of discretion. See, *e.g.*, *Mack*, 238 Ill. App. 3d at 105 (finding that defendant's rights were not violated when he and a co-defendant were tried in simultaneous but separate trials where the court explained to both juries that they were to focus on the case concerning the particular defendant whose guilt or innocence they were to decide, the court ensured that both juries heard only the evidence that was admissible against both defendants, and there was no indication that the jurors were confused or unable to render a fair

judgment); *Ruiz*, 94 Ill. 2d at 259-60; *Negron*, 220 Ill. App. 3d at 767.

Furthermore, we disagree with defendant that he and Brown presented defenses that were so antagonistic that the procedure employed by the trial court denied defendant a fair trial. As defendant acknowledges, neither he nor Brown took the stand and blamed the other for the crime. Also, defendant's attempt to portray his primary defense at trial as being the theory that Brown attempted to extort money from him is belied by the record. Our review, particularly of defendant's opening and closing arguments, reveals that defendant's primary strategy was to argue that the State's case rested almost entirely on Marley's testimony and that Marley was not a credible witness. Defendant's also focused on discrediting the State's other evidence, principally the phone records and the evidence regarding the insurance policy defendant held on the victim. Similarly, Brown's defense, particularly as it was revealed during closing arguments, was to argue that Marley's testimony with respect to Brown's involvement in the murder could not be believed. We cannot say that these defenses were so antagonistic such that it was apparent " 'that an actual and substantial hostility existed between the defendants over their lines of defense' " or that the separate but simultaneous jury trials " 'produced a spectacle where the People frequently stood by and witnessed a combat in which the defendants attempted to destroy each other.' " *Daugherty*, 102 Ill. 2d at 542, quoting *People v. Braune*, 363 Ill. 551, 555 (1936).

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and J. GORDON, J., concur.